[No. 66723-8-I.   Division One.   July 30, 2012.]

224 WESTLAKE, LLC, *Respondent*, v. ENGSTROM PROPERTIES, LLC, *Appellant*.

702

704

706

*Sylvia L. Luppert* (of *Reaugh Oettinger & Luppert PS*), for appellant.

*Christopher I. Brain* and *Adrienne McEntee* (of *Tousley Brain Stephens PLLC*), for respondent.

¶1 BECKER, J. — Engstrom Properties LLC entered into a real estate purchase option agreement that afforded the purchaser the right to perform environmental testing of the soil beneath the premises. The agreement provided that the final purchase closing date "shall be extended as is reasonably necessary to complete such . . . permitted testing." Substantial evidence supports the trial court's finding that Engstrom breached this mandatory provision, discharging the purchaser's obligation to close. We affirm the entry of judgment in favor of the purchaser. We remand, however, for recalculation of attorney fees. The record is inadequate to review whether the hours claimed were reasonable and the court relied on an improper basis for awarding fees above the lodestar amount.

## FACTS

¶2 We first present the undisputed facts, drawn primarily from findings of fact entered by the trial court after a five-day bench trial beginning October 11, 2010. The controversy is rooted in an agreement for the purchase and sale of a building at 224 Westlake Avenue North in the South Lake Union district of Seattle. The building was the original Ernst Hardware store, built in 1929. Investco Properties Development Corporation, a company formed by real estate investor Michael Corliss, expressed interest in purchasing the building from owner Engstrom Properties LLC. Investco intended to convert the building to residential apartment lofts with a restaurant or other retail on the ground level. Engstrom Properties is owned by Steve Engstrom, who signed the agreement and directed the litigation on behalf of his LLC.

¶3 In November 2006, the two companies entered into a "Real Estate Purchase Option Agreement," exhibit 1 at

trial. The agreement provided for a two-year option period, during which time Investco could evaluate the project's feasibility. Investco agreed to make quarterly payments of $75,000 during the option period, totaling $600,000. These payments would ultimately be factored into the $4.55 million purchase price if Investco decided to close.

¶4 Engstrom, for its part, promised in section 3.5 of the agreement to remove two decommissioned fuel storage tanks that were buried beneath the building and to clean up any hazardous materials in the surrounding soil to the extent required by current environmental regulations. Engstrom's completion of the cleanup was an express condition to Investco's obligation to close. Investco would be permitted to contract for its own independent soil testing to confirm the cleanup. Section 3.5 concluded with the requirement at issue in this case: "The parties further agree that the Closing Date shall be extended as is reasonably necessary to complete such tank removal, clean up and permitted testing."

¶5 Investco made the first two option payments due under the agreement, totaling $150,000. In June 2007, without informing Engstrom, Investco executed a document assigning its rights under the agreement to 224 Westlake LLC, an entity created for purposes of carrying out Investco's plans to develop the property. Westlake was jointly owned by several LLCs. These were, in turn, owned by Michael Corliss, his children, and several individuals employed by or affiliated with Investco. Westlake project manager Charlie Laboda testified that Corliss was the primary decision maker guiding the Westlake project.

¶6 Westlake picked up where Investco left off. It repaid Investco for the first option payments and early project expenses, paid the remaining $450,000 in quarterly option

payments,[1] and incurred additional project expenses that ultimately totaled upwards of $400,000.[2]

¶7 It was not until October of the following year that Engstrom learned of the assignment in a letter stating that Investco had assigned the agreement to Westlake and Westlake would be exercising the option to purchase the building. Engstrom did not raise any objection to the assignment or make any inquiries about Westlake.

¶8 Engstrom began removing the tanks and excavating contaminated soil in November 2008. Engstrom and Westlake both hired environmental consultants to test the soil. Westlake's consultants found contamination above state clean-up levels, while Engstrom's consultants did not. The record reflects that Westlake communicated its contamination findings to Steve Engstrom and his property manager on December 3, 2008.[3] Engstrom's excavation company nevertheless repoured a concrete floor over the exposed soil on the following day.[4]

¶9 In January 2009, Westlake's consultants bored through the concrete for a second set of samples to confirm Engstrom's environmental report claiming the cleanup was complete. Westlake's consultants again found contamination above the state clean-up levels. Westlake wrote to Engstrom, demanding full cleanup per section 3.5 of the agreement.

¶10 Engstrom instead retained a second environmental consultancy firm. This firm issued a report recommending that Engstrom leave the contaminated soil in place. The firm reasoned that removal of the contamination would be cost-prohibitive and it did not pose any health or environ-

---

[1] Report of Proceedings at 482; Exhibits 50, 106, 134-35, 186, 226, 238-39.

[2] Exhibits 49, 253-54.

[3] Exhibit 4.

[4] Exhibit 7, at 3; Exhibit 237, at 2.

mental threat "as long as the concrete floor slab of the basement remains in place."[5]

¶11 Westlake refused this proposal in no uncertain terms and involved counsel in the matter. On February 9, 2009, Westlake wrote to Engstrom through counsel, demanding a full cleanup and seeking an extension of the swiftly advancing closing date to accommodate cleanup and a final round of testing. Engstrom did not respond. Westlake wrote again on February 20, 2009.

¶12 When Engstrom finally responded through counsel on February 23, 2009, he disclosed for the first time that he had carried out a second excavation. He declared the cleanup was now truly complete. Westlake had received no notice of this second excavation, which the record reflects began on February 9 and concluded with another repouring of the concrete floor.[6]

¶13 Evidence in the record establishes that Westlake took immediate action to schedule further testing after learning about the second excavation.[7] Despite its swift response, however—and due in part to the special arrangements needed for drilling through concrete—Westlake was unable to schedule the testing until March 4, 2009, two days after the scheduled closing date.

¶14 Westlake again requested an extension of the closing date. Engstrom suggested an extension of 4 days—from Monday, March 2, to Friday, March 6, 2009. Westlake insisted 4 days was inadequate time to receive testing results and prepare for closing. Westlake proposed a 30-day extension from the date cleanup was confirmed. Engstrom declined, citing concerns that Westlake's real motives in seeking additional time were related to financial problems.

¶15 With this allegation, the dispute heightened. March 2, 2009, passed without an agreement to extend closing.

[5] Exhibit 12, at 6.

[6] Exhibit 237, at 7.

[7] Clerk's Papers at 103; Exhibit 247.

Westlake cancelled its scheduled testing and threatened litigation for material breach if Engstrom refused to reasonably extend closing to accommodate its right to confirm the cleanup by independent testing. Engstrom did not agree to extend beyond March 6. On March 6, Steve Engstrom went to the escrow office to execute the closing documents. His counsel wrote to Westlake, stating an expectation that Westlake would participate in closing, but Westlake refused, restating its belief that Engstrom had materially breached the agreement.

¶16 The record reflects that by March 19, Engstrom had put his property back on the market.[8] On March 26, 2009, Westlake sued for damages for breach of contract.

¶17 Several months later, Engstrom moved for summary dismissal of the suit on the basis that Investco's June 2007 assignment of the agreement to Westlake was invalid. This motion was denied, and the matter proceeded to trial. Engstrom again argued at trial that the court should dismiss the case because Westlake was not a valid party to the agreement. The court disagreed. After a five-day bench trial, the court ruled in favor of Westlake on every issue. The court found Engstrom in material breach of the agreement and awarded Westlake substantial damages, prejudgment interest, and attorney fees and costs. This appeal followed.

## VALIDITY OF ASSIGNMENT

¶18 Engstrom argues that Westlake's suit should have been dismissed for lack of standing because the June 2007 assignment from Investco to Westlake was invalid.

¶19 The agreement contained a term stating that it was not generally assignable without the other party's "prior written consent." An exception to that provision allowed Investco to assign the agreement without Engstrom's consent if the assignee was an entity in which Investco owned a majority interest of at least 51 percent:

---

[8] Exhibit 258.

> *Assignment*. This Agreement is not generally assignable by Purchaser or Seller without Seller's or Purchaser's prior written consent, which consent shall not be unreasonably withheld; provided, however, that Purchaser shall be able to assign this Agreement to a partnership or limited liability company in which Purchaser owns and continues to own through the Closing Date at least 51% of the ownership interests without the consent of Seller and upon written notice to Seller.

The record indicates that Steve Engstrom agreed to the exception based on his understanding that Corliss and his company, Investco, had a good reputation for closing transactions.

¶20 When Investco assigned the agreement to Westlake in June 2007, it did not seek Engstrom's prior consent. The assignment document shows that Investco executed the assignment under the auspices of the 51 percent ownership clause.

> Pursuant to Section 13 of the Purchase Agreement, Purchaser may assign the Purchase Agreement to a limited liability company in which Purchaser owns and continues to own through the Closing Date at least 51% of the ownership interests.
>
> NOW, THEREFORE, . . . the parties agree as follows:
>
> . . . .
>
> . . . Assignor [Investco] and Assignee [Westlake] hereby certify that at least 51% of the ownership interests of Assignee are owned by the same parties which own the shares of Assignor.

When notified of the assignment in October 2008, Engstrom did not object or ask questions about Westlake. Engstrom proceeded with its clean-up obligations under the agreement.

¶21 After Westlake filed this lawsuit, Engstrom obtained interrogatory answers detailing Westlake's ownership. These showed that the original purchaser, Investco Properties Development Corporation, was the manager of

Westlake but not the owner. Westlake was owned by five separate trusts and LLCs that, like Investco, were owned and controlled by Corliss and his affiliates. One entity, a 30 percent owner, was owned by Corliss. Another entity with at least 30 percent ownership was owned by Corliss and his three teenage children.[9]

¶22 In the summer of 2009, roughly one month after learning that Investco itself did not own Westlake, Engstrom moved for dismissal of Westlake's lawsuit.

¶23 Westlake explained to the court on summary judgment that Investco and Westlake reasonably understood the 51 percent ownership clause to refer to the overall extent to which ownership interests were *shared* between the two entities. The certification contained in the June 2007 assignment document was consistent with this "shared" ownership theory. In that document, Investco and Westlake certified "that at least 51% of the ownership interests of Assignee are *owned by the same parties which own* the shares of Assignor." (Emphasis added.) The court refused to construe section 13 as Westlake proposed and granted partial summary judgment to Engstrom: "The Real Estate Option Agreement does not allow assignment without Engstrom's consent on these facts, where Investco/Purchaser did not own 51% of 224 Westlake."

## Waiver

¶24 As a preliminary matter, we address Westlake's argument that Engstrom waived its right to challenge the validity of the assignment. Westlake first argued waiver when responding to Engstrom's motion for summary judgment. In a cross appeal, Westlake contends that Engstrom waived any right to object to the assignment by treating Westlake as the proper assignee for more than two years and objecting only after litigation had begun.

---

[9] Clerk's Papers at 48, 176; Report of Proceedings at 176.

¶25 The burden was on Westlake to prove waiver by showing an intentional and voluntary relinquishment of a known right:

> A waiver is the intentional and voluntary relinquishment of a known right. It may result from an express agreement or be inferred from circumstances indicating an intent to waive. To constitute implied waiver, there must exist unequivocal acts or conduct evidencing an intent to waive; waiver will not be inferred from doubtful or ambiguous factors. The intention to relinquish the right or advantage must be proved, and the burden is on the party claiming waiver.

*Jones v. Best*, 134 Wn.2d 232, 241-42, 950 P.2d 1 (1998) (citations omitted). Where there is "no evidence whatever" that a party had knowledge of the facts of a violation until after litigation began, there is no waiver. *Ross v. Harding*, 64 Wn.2d 231, 240, 391 P.2d 526 (1964). The evidence before the trial court showed that Engstrom did not know Westlake's true ownership until formal discovery began.

¶26 Westlake nevertheless contends that Engstrom was subject to a duty to question Investco about its percentage of ownership interest in Westlake in October 2008 when notified of the assignment. Essentially, Westlake contends Engstrom should have refused to accept Investco's representations and should have demanded proof that the formal certification satisfied the 51 percent ownership clause. Westlake cites no authority establishing such a duty, and the argument is contradicted by the well-settled rule that an implied covenant of good faith and fair dealing exists in every contract. *Badgett v. Sec. State Bank*, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). Engstrom was entitled to rely upon Investco and Westlake's representation that the assignment comported with the 51 percent ownership provision of the agreement, relieving them of the necessity to obtain Engstrom's prior written consent.

¶27 Westlake's reliance on the Supreme Court's finding of waiver in *Kessinger v. Anderson*, 31 Wn.2d 157, 196 P.2d 289 (1948), is misplaced. In that case, the court ruled that the

respondents had waived their right to object to an encumbrance on real property because the facts showed they had been "[f]ully cognizant" of the encumbrance previously and had failed to object for self-serving purposes. *Kessinger*, 31 Wn.2d at 171-72. The record does not support such a conclusion here. Instead, we conclude Engstrom did not waive his right to challenge the validity of the assignment.

## Engstrom's Appeal of the Summary Judgment Ruling

¶28 Another preliminary issue is Engstrom's contention that the merits of his challenge to the assignment should be reviewed on the record presented on the motion for summary judgment, not on the record developed at trial.

¶29 When an order denying summary judgment is based on the presence of material, disputed facts, it "will not be reviewed when raised after a trial on the merits." *Johnson v. Rothstein*, 52 Wn. App. 303, 306, 759 P.2d 471 (1988). Engstrom contends the denial of summary judgment was based on what Engstrom asserts is a purely legal issue of contract interpretation: whether Engstrom could be held to the reasonable consent requirement in section 13 even after Investco failed to seek his prior consent. But at this point, whether the issue can be properly characterized as legal rather than factual is not the controlling consideration. Rightly or wrongly, the trial court determined the motion raised a factual issue that had to go to trial, and the issue did go to trial. In such a circumstance, as a matter of fairness, this court will review the issue " 'in light of the full record' ":

> "The final judgment in a case can be tested upon the record made at trial, not the record made at the time summary judgment was denied. Any legal rulings made by the trial court affecting that final judgment can be reviewed at that time in light of the full record. This will prevent a litigant who loses a case, after a full and fair trial, from having an appellate court go back to the time when the litigant had moved for summary

judgment to view the relative strengths and weakness of the litigants at that earlier stage. Were we to hold otherwise, one who had sustained his position after a fair hearing of the whole case might nevertheless lose, because he had failed to prove his case fully on an interlocutory motion."

*Johnson*, 52 Wn. App. at 306-07, quoting *Evans v. Jensen*, 103 Idaho 937, 655 P.2d 454, 459 (1982). In *McGovern v. Smith*, 59 Wn. App. 721, 801 P.2d 250 (1990), we reached the merits of an order denying summary judgment even after a full trial, and Engstrom contends we should do the same here. But it is not clear that the legal issue on appeal in *McGovern* was ever considered at trial, as it was in this case. In *McGovern*, we reached the issue in order to "promote justice and facilitate the decision of cases on the merits." RAP 1.2(a); *McGovern*, 59 Wn. App. at 735. Limiting our review in this case to the record as developed at summary judgment would not serve those ends.

## Investco's Failure To Seek Prior Consent to Assignment

¶30  We turn now to the heart of Engstrom's challenge to the assignment. The trial court determined that the assignment was valid, despite Engstrom's lack of prior consent, because it was unreasonable for Engstrom to withhold consent. Engstrom argues the trial court committed legal error by failing to give effect to the words "prior written consent" in the text of section 13. Engstrom contends Westlake's failure to ask for consent prior to the assignment should have been the end of the court's inquiry.

¶31  The trial court's interpretation of the language of a contract is a question of law we review de novo. *Knipschield v. C-J Recreation, Inc.*, 74 Wn. App. 212, 215, 872 P.2d 1102, *review denied*, 124 Wn.2d 1027 (1994).

¶32  The contract language states, "This Agreement is not generally assignable by Purchaser or Seller without Seller's or Purchaser's prior written consent, which consent shall not be unreasonably withheld." Despite Investco's failure to seek Engstrom's consent, the court focused on

whether there was a reasonable basis for Engstrom to withhold consent. *See Robbins v. Hunts Food & Indus., Inc.*, 64 Wn.2d 289, 296-97, 391 P.2d 713 (1964) (whether a party's refusal of consent is unreasonable is a question of fact "to be measured by the action which would be taken by a reasonable man in like circumstances"). The court concluded there was not.

¶33 The stock purchase agreement at issue in *Robbins* had a provision substantially like section 13, forbidding assignment without the other party's prior written consent, which consent could not be unreasonably withheld. In *Robbins*, as in this case, the purchaser gave notice of an assignment after it had already executed the assignment. *Robbins*, 64 Wn.2d at 292. Upon learning of the assignment, the seller refused consent. The Supreme Court ruled the assignment was valid despite the lack of prior consent because the seller's denial of consent was unreasonable—and the contract prohibited him from unreasonably withholding consent. In other words, the assignment provision relieved the assignor of the consent requirement in the event of an unreasonable refusal of consent. *Robbins*, 64 Wn.2d at 296-97.

¶34 Under the guidance of *Robbins*, we conclude the trial court correctly construed section 13 as holding Engstrom to the reasonable consent requirement, despite Investco's failure to seek prior consent. This conclusion is consistent with the general policy favoring the free assignability of contracts. Contracts are assignable unless such assignment is expressly prohibited by statute or contract or is in contravention of public policy. *Berschauer/ Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 829, 881 P.2d 986 (1994). Antiassignment provisions are to be narrowly construed. *Burleson v. Blankenship*, 193 Wash. 547, 549, 76 P.2d 614 (1938). Engstrom's proposed reading of section 13 would give effect to the "generally" applicable language of prior consent, while ignoring those words' *mandatory* condition: "which consent *shall not* be

unreasonably withheld." (Emphasis added.) Given the provision's general versus mandatory language, the trial court was correct to read reasonableness to be the dominant requirement.

¶35 We are aware of examples in the landlord tenant context where courts have voided tenants' assignments of their lease agreements because they failed to first obtain prior consent as required by the lease. *See, e.g., Behrens v. Cloudy*, 50 Wash. 400, 401, 97 P. 450 (1908). But such examples are unhelpful as the leases required prior consent without specifically forbidding the landlords from unreasonably withholding consent. *See, e.g., Behrens*, 50 Wash. at 401 (lease required tenant to obtain landlord's "written consent" without limiting landlord's behavior); *Healthco, Inc. v. E&S Realty Assocs.*, 400 Mass. 700, 703, 511 N.E.2d 579 (1987) (voiding lease assignment after specifically noting the assignment provision "contains no language about withholding consent unreasonably").

¶36 Engstrom argues *Robbins* should be distinguished because in *Robbins*, it was only a few days after the assignment was made that notice was given and consent requested, and the obligor to the contract began business transactions with the assignee with full knowledge that an assignment had occurred without its consent. By contrast, Engstrom was not given notice of the assignment until over a year had elapsed. And it was not until litigation began six months later that Engstrom became aware that its consent should have been requested because Westlake was not owned by Investco. This distinction based on the amount of time elapsed does not provide a clear rationale for refusing to apply *Robbins*.

¶37 But this factual difference does leave aspects of Engstrom's challenge unanswered. *Robbins* did not explicitly address whether courts should direct the reasonableness inquiry to the time period leading up to when the assignment was actually executed—the operative period when prior consent would be expected—or to the time

period when the obligor actually learned an assignment had taken place without its consent. In *Robbins,* this distinction was probably immaterial because notice was communicated "several days" after the assignment took place. *Robbins,* 64 Wn.2d at 292. Here, however, Westlake's status changed considerably in the interim. It went from being a newly created entity at the time of assignment to an entity with a performance record of significant expenditures on the project at the time Steve Engstrom actually considered whether he wanted to withhold consent.

¶38 No Washington authority has directly addressed this question, but in *Robbins,* the court focused on the circumstances at the later point in time—when consent was refused. *Robbins,* 64 Wn.2d at 296 (the seller "having withheld its consent, the basic inquiry then is whether its action, under the circumstances, was unreasonable"). Following *Robbins,* we conclude the reasonableness of Engstrom's withholding of consent is examined as of the summer of 2009 when Engstrom, having learned that his consent was required, decided to withhold it, not as of June 2007 when Investco made the assignment.

¶39 The record indicates that the trial court focused on October 2008, when Engstrom received notice of the assignment. This is not the correct point in time in this case because the notice did not alert Engstrom to the fact that the assignment was being executed under circumstances that required his written consent. But the difference between October 2008 and the summer of 2009 is immaterial here because, as we discuss below, Steve Engstrom's professed concern was that the option agreement required him to keep the property off the market for an extended period of time. He wanted assurance that the purchaser was an entity with the financial ability to close when the option period ended. From October 2008 on, there was no reason to doubt Westlake's ability to close.

### Whether Engstrom's Refusal of Consent Was Reasonable

¶40 The court found that Engstrom's refusal to consent was unreasonable and that the position taken by Engstrom during litigation as to this issue lacked "credibility." Engstrom challenges these findings.

¶41 We review the trial court's decision following a bench trial to determine whether the findings of fact are supported by substantial evidence and whether those findings support the conclusions of law. *Endicott v. Saul*, 142 Wn. App. 899, 909, 176 P.3d 560 (2008). Evidence may be substantial even if there are other reasonable interpretations of the evidence. *Sherrell v. Selfors*, 73 Wn. App. 596, 600-01, 871 P.2d 168, *review denied*, 125 Wn.2d 1002 (1994).

¶42 Unchallenged findings of fact are verities on appeal. *In re Estate of Jones*, 152 Wn.2d 1, 8, 93 P.3d 147 (2004). Engstrom does not challenge the following findings: His stated objection to the assignment was based on concerns with Westlake's financial ability to close.[10] When Engstrom learned of the assignment, Investco and Westlake had already paid the full $600,000 in option payments. Engstrom did not object to or ask questions about the assignment. Engstrom never requested financial information about Investco or Westlake to prove their ability to close. Engstrom did not complain about the assignment when answering Westlake's complaint. Engstrom first voiced concerns over the assignment in August 2009 upon moving for summary judgment.[11]

¶43 These unchallenged findings support the court's ultimate finding that a "reasonably prudent person in Engstrom's position, having received all monies to which it was entitled under the Option Agreement, would not have

---

[10] Steve Engstrom admitted on cross-examination that the reason he opposed the assignment to Westlake was because of his concern with its ability to close. Report of Proceedings at 399.

[11] Findings of Fact 6, 8, 9, 10.

withheld consent to the Assignment," and they support the ultimate conclusion that Engstrom's refusal to consent to the assignment was unreasonable.[12] The reasonableness of a refusal of consent to an assignment is to be measured objectively by the action which would be taken by a reasonably prudent person in like circumstances. *Robbins*, 64 Wn.2d at 296-97; *Ernst Home Ctr., Inc. v. Sato*, 80 Wn. App. 473, 482, 910 P.2d 486 (1996). "Reason, fairness, and good faith must be the guide. Whim, caprice, or opportunism, however expedient the end, will not suffice." *Robbins*, 64 Wn.2d at 296-97. Factors that an obligor may consider in such a circumstance include whether the assignor wished to assign the agreement in good faith, and not as a means of avoiding obligations, and whether the assignee was a "competent, qualified, and financially sound successor" capable of assuming the assignor's obligations. *Robbins*, 64 Wn.2d at 297.

¶44 Record evidence establishes that by October 2008, Westlake had paid nearly one million dollars in option payments and project development costs under the agreement.[13] The record also reflects that as of March 5, 2009, Westlake possessed in its bank account the full total needed to close the purchase, in excess of $4.11 million. A reasonably prudent person in Engstrom's position, concerned primarily about the purchaser's financial ability to close, should have been satisfied by Westlake's significant expenditures.

---

[12] Finding of Fact 10; Conclusion of Law 4.

[13] The record reflects that by October 2008, Westlake had paid a total of $967,155.91 on the project, which included $600,000.00 in option payments and $367,155.91 in project invoices. It repaid Investco on July 2, 2007, for $23,933.68 in early project expenses and $150,000.00 in option payments. Exhibit 52. Between July 19, 2007, and October 20, 2008, it incurred an additional $343,222.23 in development expenses and paid the final $450,000.00 in option payments. Exhibit 239, check numbers 102 through 160. The court's finding of fact 8 erroneously states that by October 2008, Westlake's development expenses alone—independent of option payments—totaled $437,354.15. This was the total claimed by Westlake for its development expenses by the time of trial in 2010.

¶45 Steve Engstrom claims he did not know Westlake had made these expenditures because even the option payments made from Westlake's bank account were communicated on Investco letterhead. Engstrom's ignorance of Westlake's contributions does not justify his refusal of consent. Also, Engstrom's claim that he made deep inquiries into Investco's financial reputation before entering into the agreement was contradicted by the evidence presented at trial that Investco Properties Development Corporation possessed virtually no ownership interests in real property assets. Instead, Investco operated on the business model of transferring assets before closing to newly formed, single-asset LLCs. As the trial court commented, the entities that owned Investco were essentially "the same people" who owned substantial interests in Westlake and these entities had significant assets. Engstrom's claim that he would not have wished to work with a single-asset LLC was contradicted by his testimony that he owned the 224 Westlake building by the same arrangement. Engstrom is a trained CPA (certified public accountant) and a successful businessman. Such factors undermined his argument that if he had been asked for his consent before the assignment, he would have sincerely objected to Investco's creation of an LLC to organize the development of the property.

¶46 Engstrom's challenge to the assignment is denied.

## MATERIAL BREACH

¶47 The trial court concluded that Engstrom materially breached the agreement by refusing to reasonably extend closing to accommodate Westlake's right to complete its soil testing and that this breach discharged Westlake's duty to close.

¶48 Engstrom mounts no compelling challenges to the dispositive findings that underpin this conclusion. The court found that Engstrom's proposed extension from March 2 to March 6, 2009, provided insufficient time for Westlake "to

arrange and perform independent testing, obtain the necessary analysis and report, and prepare to close." Substantial evidence supports this finding. The record reflects that Westlake contacted its consultant on February 23, 2009, the same day it received Engstrom's letter disclosing that he had performed additional cleanup. Because 3 to 5 days' notice was needed to arrange for the concrete drill rig, however, testing could not be scheduled until March 4, 2009. Westlake's consultant testified that 3 to 4 weeks were ordinarily required to schedule the drill rig, test the soil, get the soil to the lab, analyze the results, and prepare a report. Engstrom's consultant testified that standard turnaround time for the chemical analysis was 10 days. Although expedited testing was available as early as 24 hours after testing, additional time was required to complete a report.

¶49 Engstrom argues section 3.5 entitled Westlake to obtain just the testing results without the benefit of a formal report. The agreement does not contain such a restriction. Rather, it affords the purchaser significant discretion to "contract for *any* additional environmental testing" that it "*may* deem necessary or appropriate." (Emphasis added.)

¶50 Substantial evidence also supports the finding that Engstrom "demanded" and "insisted" on a March 6, 2009, closing. Steve Engstrom testified at trial that he was "always" willing to extend closing beyond March 6, 2009, but the record does not otherwise support his position. Despite a significant back and forth between the attorneys on this issue between February 9 and March 6, 2009, Engstrom never moved beyond his initial proposal to extend closing to March 6, 2009. On March 4, 2009, Engstrom stated through counsel that it could "cut its losses now" by declaring Westlake "in default as of March 2 or March 6, 2009 and put the property back on the market."[14] This

[14] Exhibit 21.

statement was a clear assertion that in Engstrom's view, any extension beyond March 6, 2009, would constitute a "default" by Westlake, justifying Engstrom's repudiation of the entire agreement.

¶51 Substantial evidence supports the court's finding that the reason the deal did not close was "because 224 Westlake was not able to perform confirmatory testing by the March 6 date demanded by Engstrom." Until Engstrom's recalcitrance over the extension of closing, Westlake's behavior was consistent with an intent to purchase the building. Westlake made repeated requests, via project manager Charlie Laboda, Michael Corliss, and counsel, for Engstrom to complete the required cleanup so that the parties could follow through to closing. Westlake's bank records show it paid for a variety of development expenses on the project through February 2009, including a payment in January 2009 of over $30,000 for architectural design of the anticipated building remodel. Westlake had the total funds needed to close the purchase in its bank account as of March 5, 2009.

¶52 Engstrom challenges the court's finding that his failure to extend closing constituted a material breach. The materiality of a breach is a question of fact. *Bailie Commc'ns, Ltd. v. Trend Bus. Sys.*, 53 Wn. App. 77, 82, 765 P.2d 339 (1988), *review denied*, 113 Wn.2d 1025 (1989). A material breach is one that "substantially defeats" a primary function of an agreement:

> [M]ateriality is a term of art in contract analysis, and identifies a breach so significant it excuses the other party's performance and justifies rescission of the contract. As stated in the *Washington Pattern Jury Instructions: Civil*, a material breach is one "serious enough to justify the other party in abandoning the contract . . . one that substantially defeats the purpose of the contract."

*Park Ave. Condo. Owners Ass'n v. Buchan Devs., LLC*, 117 Wn. App. 369, 383, 71 P.3d 692, 75 P.3d 974 (2003) (footnote

omitted), quoting 6A WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CIVIL 302.03, at 127 (1997).

¶53 Westlake argues the purpose of the agreement was to contract for the sale of a "clean building," and Engstrom's refusal to extend closing prevented Westlake from confirming that the building was clean. This position finds substantial support in the agreement reviewed as a whole. The provisions setting forth the environmental clean-up process are the only standouts from an otherwise ordinary real estate purchase option agreement. Cleanup and environmental hazards are referenced directly or by cross-reference in no fewer than six sections. Michael Corliss emphasized at trial that the environmental cleanup of the building was a deal breaker for Investco and Westlake because of his disastrous experience of purchasing a property contaminated by mercury in 1986.

¶54 Engstrom's "No Further Action" letter, procured from the Department of Ecology on April 27, 2009, is of no consequence in this regard. Even if this letter had been available to the parties in February 2009, it would not have displaced Westlake's right to carry out its own independent testing. Nor would such a letter have relieved Engstrom of its duty to agree to a reasonable extension of closing to accommodate Westlake's exercise of this right.

¶55 The trial court properly concluded Engstrom's material breach discharged Westlake's duty to close. " 'A breach or non-performance of a promise by one party to a bilateral contract, so material as to justify a refusal of the other party to perform a contractual duty, discharges that duty.' " *Jacks v. Blazer*, 39 Wn.2d 277, 285, 235 P.2d 187 (1951), quoting 2 RESTATEMENT OF CONTRACTS § 397, at 750 (1932).

¶56 The evidence presented the trial court with a number of close calls. But it is well settled that evidence may be substantial even if the record permits other reasonable interpretations. *Sherrell*, 73 Wn. App. at 600-01. We find no

error in the court's findings and conclusions of a material breach by Engstrom.

## TENDER INTO ESCROW

¶57 Engstrom contends Westlake breached the agreement by failing to tender the purchase price into escrow. Engstrom cites the Supreme Court's decision in *Willener v. Sweeting*, 107 Wn.2d 388, 730 P.2d 45 (1986), where the court held that if a contract for purchase of real estate imposes concurrent duties, a party who does not perform and whose failure to perform is not excused may not bring an action for contract damages. *Willener*, 107 Wn.2d at 394-96. In *Willener*, a purchase and sale agreement imposed concurrent duties at closing, but the prospective purchasers failed to deposit their down payment into escrow. The court ruled the purchasers had no right to sue for breach. *Willener*, 107 Wn.2d at 396.

¶58 Closing duties are not concurrent where a condition exists that must be satisfied before a party's obligation to close is triggered—"where performance of one party is a condition precedent to a right of action on performance of another." *Willener*, 107 Wn.2d at 395. A condition precedent is an event that "must exist or occur before there is a right to immediate performance." *Walter Implement, Inc. v. Focht*, 107 Wn.2d 553, 556-57, 730 P.2d 1340 (1987).

¶59 The agreement in this case set forth conditions that had to be satisfied before Westlake had a duty to close. Under section 3.5, Engstrom's completion of the tank removal and cleanup was an express "condition to Purchaser's obligation to Close." That section concluded with the mandatory requirement that the closing date "*shall be* extended as is reasonably necessary to complete such tank removal, clean up and permitted testing." (Emphasis added.) Section 5.1, which set forth the closing procedures, made the closing deadline "subject to extension of such date pursuant to Section 3.5 above."

¶60 Sections 3.5 and 5.1 made Engstrom's agreement to reasonably extend closing a condition precedent to his right of performance by Westlake. A party is "not required by law to do a useless act and tender performance where the other party cannot or will not perform that party's part of the agreement." *Willener*, 107 Wn.2d at 395.

¶61 Engstrom's refusal to perform the condition precedent was apparent to Westlake by the time of closing. On February 27, 2009, Westlake objected to Engstrom's refusal to extend closing beyond March 6, 2009. On March 5, 2009, Westlake repeated the objection and alleged that Engstrom's recalcitrance on the extension issue "will constitute, in our opinion, a material breach of the [purchase and sale agreement]." On March 6, 2009, Westlake refused to tender funds into escrow "as it is not reasonable to demand that we do so. Our position is that [Engstrom] is in material breach."[15] This record makes this case unlike *Willener*, where the purchaser failed to tender the purchase price at closing even though the seller's breach was not evident until several weeks later. *Willener*, 107 Wn.2d at 395 ("neither plaintiffs nor defendants could have known on the closing dates the other party 'could not, would not and was not going to perform' as required by the agreement"). The purchaser in *Willener* did not even raise the question of the seller's breach until several days past the closing date. *Willener*, 107 Wn.2d at 392.

¶62 We conclude Westlake was not required to tender the purchase price into escrow in order to have a breach of contract action against Engstrom.

## ENTRY OF FINDINGS AND CONCLUSIONS

¶63 Engstrom contends the trial court violated CR 52(c) by signing and entering Westlake's proposed findings of fact and conclusions of law without first issuing a formal

[15] Exhibits 20, 22, 23.

notice of presentation. We disagree. CR 52(c) requires that parties be given five days' notice before the "submission" of proposed findings, not before their entry:

Unless an emergency is shown to exist, or a party has failed to appear at a hearing or trial, the court shall not sign findings of fact or conclusions of law until the defeated party or parties have received 5 days' notice of the time and place of the submission, and have been served with copies of the proposed findings and conclusions.

Both parties submitted their proposed findings and conclusions before the trial began. Engstrom had access to Westlake's proposed findings and conclusions by the first day of trial. The court did not sign and enter those findings until December 20, 2010, approximately two months later.

¶64 The purpose of CR 52(c) is to afford the defeated party an opportunity to evaluate and object to the contents of its opponent's proposed findings before the court adopts and enters those findings. *See Seidler v. Hansen*, 14 Wn. App. 915, 919, 547 P.2d 917 (1976). Engstrom had the entire two months after the trial to submit objections or clarifications to errors contained in Westlake's proposed findings. Engstrom could also have submitted a motion for reconsideration under CR 59. Even now, Engstrom is able to challenge the court's findings and conclusions on appeal. There is no prejudice. *Yakima County v. Evans*, 135 Wn. App. 212, 222-23, 143 P.3d 891 (2006).

## DAMAGES

¶65 Engstrom makes a variety of challenges to the trial court's award of damages to Westlake. The court awarded $436,310 in actual damages to cover what Westlake spent on development expenses, including invoices to "architects, engineers, surveyors, traffic consultants, permits, and site plans, among other development-related expenses," as well as the $600,000 paid to Engstrom in option payments.

¶66 The general measure of damages for breach of contract is that the injured party is entitled to (1) recover all damages that accrue naturally from the breach and (2) be put into as good a pecuniary position as he would have had if the contract had been performed. *Eastlake Constr. Co. v. Hess*, 102 Wn.2d 30, 39, 686 P.2d 465 (1984). Damages are recoverable if they were within the contemplation of the parties at the time the contract was made, are the proximate result of defendant's breach, and are proved with reasonable certainty. *Larsen v. Walton Plywood Co.*, 65 Wn.2d 1, 390 P.2d 677 (1964). The burden of proof is on the party seeking damages. *Columbia Park Golf Course, Inc. v. City of Kennewick*, 160 Wn. App. 66, 83, 248 P.3d 1067 (2011). An appellate court will not disturb an award of damages made by the fact finder unless it is outside the range of substantial evidence in the record, shocks the conscience, or appears to have been arrived at as the result of passion or prejudice. *Mason v. Mortg. Am., Inc.*, 114 Wn.2d 842, 849, 792 P.2d 142 (1990).

¶67 Engstrom's first theory is that the entire damages award violated the agreement's limitation on remedies, which required Westlake to choose between terminating the agreement and pursuing an action for damages:

> If Seller fails to perform any covenant of Seller contained herein, *Purchaser may elect either to terminate this Agreement or pursue any other remedy* including, but not limited to, an action for specific performance or actual damages against Seller.

(Emphasis added.) Engstrom contends Westlake "did not elect between terminating the Agreement and pursuing an action for damages, it did both." We disagree. Westlake made a single election: to bring a suit for actual damages for breach of contract.

¶68 Engstrom also contends Westlake's damages should have been reduced because Engstrom's breach prevented Westlake from suffering a loss on the purchase after

the 2007 market downturn made the property worth less than the agreed $4.55 million purchase price. Engstrom cites *Johnson v. Brado*, 56 Wn. App. 163, 783 P.2d 92 (1989), *review denied*, 114 Wn.2d 1022 (1990), and *Carlson v. Leonardo Truck Lines, Inc.*, 13 Wn. App. 795, 538 P.2d 130 (1975). These cases are inapposite. In *Johnson*, both parties had performed; the purchaser took possession of the property and then sued for negligent misrepresentation. Westlake, by contrast, retained no ownership interest in Engstrom's property, so the current value of the property was of no consequence to Westlake's damages award. In *Carlson*, the purchasers wanted "benefit of the bargain" damages based on their lost business opportunity after the seller breached by selling to another buyer. This court affirmed a ruling denying them this relief. The purchasers were not entitled to damages under this theory because the actual value of the property was much less than the price the purchasers had promised to pay. But we expressly stated that purchasers "would be entitled to recover, however, if they should establish that they suffered damages which were . . . 'within the contemplation of the parties at the time the contract was made'" and were proximately caused by the seller's breach. *Carlson*, 13 Wn. App. at 799, quoting *Larsen*, 65 Wn.2d at 15. Unlike in *Carlson*, Westlake did submit proof of over one million dollars of actual damages it incurred in furtherance of the project. In awarding Westlake the return of its option payments as well as its full development expenses, the court concluded:

> Had Defendant performed as required under the Option Agreement, Plaintiff would have had the benefit of its investment. The Court therefore concludes that the $1,036,310.00 in damages naturally accrued from Defendant's breaches. They were foreseeable because the parties expressly agreed that the purchaser would have the right to conduct development activities during the option period.

We conclude the trial court correctly applied the rule of *Larsen*.

¶69 Engstrom's next theory is that the $600,000 in option payments were nonrefundable because they were paid in consideration for the option itself, which Westlake enjoyed for two years and during which time Engstrom was prevented from selling the property to another buyer. This theory would have allowed Engstrom to benefit fully from the consideration Westlake paid for the option even though Engstrom's breach prevented Westlake from bringing the option to fruition. Because of Engstrom's breach, Westlake was not obligated to close and was free to pursue the return of the option payments as part of its damages.

¶70 Engstrom cites *Hopkins v. Barlin*, 31 Wn.2d 260, 196 P.2d 347 (1948), where the Supreme Court denied a purchaser a return of his payments made under an option agreement. But in that case, the seller had done nothing to prevent the purchaser from exercising the option:

> It is undisputed that respondent kept the option open for the full time specified therein *and did nothing which in any way interfered with appellant's right to purchase and acquire the property upon the terms and conditions of the option*, had he so elected.

*Hopkins*, 31 Wn.2d at 270 (emphasis added). Engstrom, by contrast, did interfere with Westlake's right to "acquire the property upon the terms and conditions of the option." *Hopkins*, 31 Wn.2d at 270. As a result, Westlake never obtained the benefit for which it bargained under the option contract.

¶71 Engstrom next argues that both types of damages awarded by the court were expressly prohibited by various provisions of the agreement because Westlake failed to close the deal. But Westlake's failure to close was not a violation of the terms of the agreement after Engstrom's breach discharged Westlake's duty to close. Engstrom is the breaching party in this case and is not entitled to any benefit under the agreement based on Westlake's failure to close.

¶72 Engstrom also contends the court abused its discretion by admitting into evidence midtrial two documents providing summaries of Westlake's development expenses. These documents updated the summary document included with Westlake's original binder of trial exhibits. Engstrom provides no authority to support this assignment of error.

¶73 The court's admission of the summary documents was not improper. ER 1006 permits introduction of a "chart, summary or calculation" to summarize the "contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court," so long as the items summarized are timely made available to the other party. Westlake provided Engstrom photocopies of the individual receipts, invoices, and cancelled checks summarized in the documents. The only exception was a small number of recent expenses described in the updated summary documents, for which invoices were not provided. Westlake's project manager Charlie Laboda testified to the accuracy of these expenses, and Engstrom had an opportunity to cross-examine him. Engstrom provides no compelling reason why Laboda's testimony should not be credited.

¶74 Each of the three documents provided a different total damages figure. Laboda explained the reason for the different totals. The original vendor ledger, exhibit 254, gave a total of $441,834.12. It included all invoices paid through May 1, 2009. The current vendor ledger, exhibit 49, showed a higher total of $480,104.65. This updated document included all recent invoices incurred before trial in October 2010. The summary of current invoices, exhibit 253, had a lower, revised total of $437,354.15. Exhibit 253 reproduced the contents of exhibit 49 in a different format and subtracted the legal expenses paid to Westlake's litigation attorneys since those expenses were to be separately considered by the court in its award of attorney fees. Laboda's explanations were reasonable.

¶75 We conclude the court's reliance on the summary documents to establish the total of the actual dam-

ages was based on tenable grounds and on a reasonable understanding of their accuracy. It was not an abuse of discretion. *Haselwood v. Bremerton Ice Arena, Inc.*, 137 Wn. App. 872, 889-90, 155 P.3d 952 (2007), *aff'd*, 166 Wn.2d 489, 210 P.3d 308 (2009).

¶76 The fact that the figure of $436,310 included in the judgment is lower than the figures provided in the three summary documents does not rebut the court's finding that this total was proved "with exactness," nor does it render the court's judgment in that amount an abuse of discretion. At oral argument on appeal, Westlake's counsel explained that he invited the approximate $1,000 reduction after realizing that he had incorrectly included a litigation invoice in a listed damages expense. We accept counsel's explanation. The correction was reasonable.

¶77 Engstrom contends Westlake's $436,310 expense calculation improperly included $150,000 of option payments that were separately awarded in the $600,000 option payment award. After a painstaking review of the record, we conclude this $150,000 was not double-counted. On page 1 of the expense summary, exhibit 253, these first two option payments of $75,000 each are accounted for within a $173,933 reimbursement to Investco on July 2, 2007. On page 2 of the expense summary, Westlake claims an additional $450,000 in "option payments" made to Engstrom— not an additional $600,000. The other two summary documents are also proper in this regard.[16]

---

[16] At the bottom of page 1 of the current vendor ledger provided in exhibit 49, the first $150,000.00 in option payments are accounted for within the payment to Investco totaling $173,933.68. Six additional $75,000.00 "option payment[s]" to Chicago Title, totaling $450,000.00, are listed further up on the same page. Likewise, on page 3 of the original vendor ledger provided in exhibit 254, Westlake claims $600,000.00 in "Land Costs," which includes an initial payment of $150,000.00 and six subsequent payments of $75,000.00 (totaling $600,000.00). This document does not include a separate payment to Investco in the amount of $173,933.68; rather, each expense included in that reimbursement total is individually accounted for according to expense type across the four-page summary document.

¶78 Finally, Engstrom contends the damages award improperly included "intercompany charges or entity expenses" totaling $85,000. The disputed expenses were comprised of $5,000 per month "development fees" paid by Westlake to Investco Properties Development Corporation.[17] Laboda testified that these fees paid the salaries of Investco employees who carried out the development of the project. It was reasonably foreseeable to Engstrom that the purchaser would incur employee salary costs in furtherance of the project development. These damages were properly included in the award.

¶79 The damages award is affirmed.

## ATTORNEY FEES AWARD

¶80 Engstrom assigns error to the court's award of $312,826.24 in attorney fees and costs to Westlake. The reasonableness of an attorney fee award is subject to review for abuse of discretion. *Bowers v. Transamerica Title Ins. Co.*, 100 Wn.2d 581, 597, 675 P.2d 193 (1983).

¶81 The agreement authorizes an award of reasonable attorney fees to a prevailing party in a suit to enforce the terms of the contract. There is no dispute that Westlake was the prevailing party at trial.

¶82 A determination of reasonable attorney fees begins with a calculation of the "lodestar," which is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. *Morgan v. Kingen*, 166 Wn.2d 526, 539, 210 P.3d 995 (2009); *Mahler v. Szucs*, 135 Wn.2d 398, 433-34, 957 P.2d 632, 966 P.2d 305 (1998). To establish the reasonableness of the fee award, the attorney's documentation of the work performed must satisfy at least a minimum level of detail. "The court must limit the lodestar to hours reasonably expended, and should therefore discount hours spent on unsuccessful claims,

---

[17] Exhibit 83.

duplicated effort, or otherwise unproductive time." *Bowers*, 100 Wn.2d at 597. The trial judge "who has watched the case unfold . . . is in the best position to determine which hours should be included in the lodestar calculation." *Chuong Van Pham v. Seattle City Light*, 159 Wn.2d 527, 540, 151 P.3d 976 (2007).

¶83 After the lodestar figure is calculated, the court may consider an adjustment based on additional factors under two broad categories: "the contingent nature of success, and the quality of work performed." *Bowers*, 100 Wn.2d at 598. The party proposing the deviation from the lodestar bears the burden of justifying it. *Bowers*, 100 Wn.2d at 598.

¶84 After the trial, the court requested further briefing from the parties as to damages and attorney fees. Westlake's lead counsel, Christopher Brain, submitted declarations explaining the firm's general billing practices, briefly describing the qualifications of the two primary attorneys, listing the hourly rates of other attorneys and legal staff who worked on the matter "as needed," and summarizing in broad brush strokes the work the firm performed during the many months of litigation.[18] He attached to his declaration two "Summary Fee Transaction File Lists" of less than one page, stating the total hours claimed by each of five attorneys, a law clerk, and a

---

[18] In its findings of fact on the issue of attorney fees, the court referred to three declarations by Brain but only two declarations by Brain concerning attorney fees are included in the record on appeal. *See* Clerk's Papers at 318-41, 365-71.

Brain summarized the work as follows:

> The work performed . . . can be generally described as follows: Analyzed 224 Westlake's claims; researched legal issues; drafted the complaint; drafted an opposition to Engstrom's motion for leave to amend; drafted an opposition to Engstrom's motion for summary judgment; drafted an opposition to Engstrom's motion for discretionary review to the Court of Appeals; drafted interrogatories and requests for production; drafted motion and reply briefs to compel discovery production; conducted and defended depositions; prepared for and presented a trial before this Court regarding the issues set forth in 224 Westlake's complaint; drafted the memorandum regarding damages and fees and costs; and drafted motion to show cause regarding Engstrom's fraudulent transfer of an asset.

Clerk's Papers at 320.

paralegal. The lists did not detail the work performed by each timekeeper or the dates of performance. Brain stated in his declaration that he would make a detailed billing history available to the court for in camera review if the court asked him to.

¶85 Brain also described the modified "contingency fee arrangement" governing the firm's entitlement to fees from Westlake. Brain declared that the firm's costs of operation generally amount to 65 to 70 percent of the hourly fees billed. The firm began its work in this matter on February 9, 2009, at its regular hourly rates. The firm and Westlake later agreed that as of January 1, 2010, the firm would bill only 50 percent of its fees to Westlake and would be limited to that amount if Westlake did not prevail at trial. If Westlake did prevail, the bill for fees would be "trued up" to the full rate, and the firm would also receive from Westlake 15 percent of the award of damages, including prejudgment interest.

¶86 Engstrom asked Westlake for a copy of the billing invoices and fee agreements for purposes of preparing a response to Westlake's claim for attorney fees. Westlake refused to provide them on the basis that they contained privileged information. Westlake again stated that the detailed billings would be provided to the court for in camera review if requested.

¶87 The court did review the detailed billings. After reviewing them in camera, the court entered findings and conclusions. The court first determined that "per court examination," a reasonable lodestar fee was $110,000.00 for the total work completed. There are no findings explaining why this figure was lower than the $123,073.50 lodestar requested by Westlake. The court then found that Westlake's attorneys are "entitled to a lodestar adjustment consistent with their modified contingency fee agreement." The court also found that the fee agreement "is reasonable and reasonably allocated the trial risk and reward" between Westlake and Brain's law firm. The formula in the fee agreement

resulted in an upward adjustment of $190,402.00, bringing the total fee award to $300,402.00. This represents a multiplier of approximately 2.73. The court adopted Westlake's assertion that the fees and costs incurred by Westlake under the modified contingency fee agreement were "reasonable for the services performed" in light of "the complexity and number of factual and legal issues raised in this case, the length of the dispute, the amount of briefing, and the results obtained."

¶88 Engstrom does not contest the standard billing rates charged by Westlake's attorneys. Engstrom challenges the lodestar multiplier. Engstrom's objection is that increasing the award from the lodestar of $110,000.00 to $300,402.00 nearly tripled it, resulting in an excessive fee award. By our calculation, the average effective rate after the multiplier was $660.37 per hour for each timekeeper, including paralegals and a law clerk.[19]

¶89 Generally, the complexity of a case does not warrant application of a lodestar multiplier. An enhancement for quality of work performed is "an extremely limited basis for adjustment, because in virtually every case the quality of work will be reflected in the reasonable hourly rate." *Bowers*, 100 Wn.2d at 598-99. Here, the trial court said the factors justifying the increase in the lodestar were "the complexity and number of factual and legal issues raised in this case, the length of the dispute, the amount of briefing, and the results obtained." All of these factors were already accounted for in the lodestar, either in the higher number of hours expended in trial and briefing, or in the higher hourly rate of the attorneys skilled and experienced enough to analyze complex issues and obtain a good result. *See Bowers*, 100 Wn.2d at 599. Taking account of these factors again by multiplying the lodestar is unwarranted unless the quality of the representation is found to be truly exceptional for the rate charged. *Bowers*, 100 Wn.2d at 599;

---

[19] We reach this figure by dividing the fee award (exclusive of costs) of $300,402 by the 454.9 total hours billed.

*see also Travis v. Wash. Horse Breeders Ass'n*, 111 Wn.2d 396, 411, 759 P.2d 418 (1988). We conclude the findings do not support enhancing the lodestar for the quality of work performed.

¶90 While the lodestar represents a presumptively reasonable fee, "occasionally a risk multiplier will be warranted because the lodestar figure does not adequately account for the high risk nature of a case." *Pham*, 159 Wn.2d at 542. "The contingency adjustment is based on the notion that attorneys generally will not take high risk contingency cases, for which they risk no recovery at all for their services." *Pham*, 159 Wn.2d at 541, citing *Bowers*, 100 Wn.2d at 598. An adjustment for the contingent nature of success "should apply only where there is no fee agreement that assures the attorney of fees regardless of the outcome of the case." *Bowers*, 100 Wn.2d at 599. "In adjusting the lodestar to account for this risk factor, the trial court must assess the likelihood of success at the outset of the litigation." *Bowers*, 100 Wn.2d at 598.

¶91 In view of these basic principles, we find no tenable grounds for enhancing the lodestar for the "contingent" nature of this case. The trial court did not assess the likelihood of success at the outset of the litigation or at any other time. The attorneys at all times had a fee agreement that assured them of getting paid. They were paid their full hourly rate from February 2009 until January 2010 and thereafter were paid at half their hourly rate. In this respect, the case resembles *Travis*. In *Travis*, an attorney began the case on a contingent fee, but then brought in another attorney to act as lead trial counsel at a fixed hourly rate payable by the client regardless of outcome. The trial court's application of a 1.5 multiplier, based partly on the contingent nature of the representation, was reversed on appeal. The court concluded that obligating the client to such a large fixed liability was inconsistent with a claim that the case had little chance of success. *Travis*, 111 Wn.2d at 412. Similarly here, Westlake throughout was obligated to pay at least half the firm's regular hourly rates.

¶92 At oral argument on appeal, counsel stated that the modified contingency fee agreement was entered into when Westlake's principals became concerned about continuing to pay legal fees on a project that was no longer going forward. Counsel also commented that the agreement represented an experiment in moving away from the standard "time and materials" billing concept. Seen in this light, the litigation after the partially contingent fee was agreed on was a type of joint venture. It was not a high risk contingency case in which the lawyers risked no recovery at all for their services.

¶93 This case does not involve a statutory provision for attorney fees that is to be liberally construed to serve its beneficial purposes. *Cf. Bowers*, 100 Wn.2d at 594 (discussing such a provision in the Consumer Protection Act, RCW 19.86.920); *Pham*, 159 Wn.2d at 542 (Washington Law Against Discrimination, chapter 49.60 RCW, "places a premium on encouraging private enforcement and . . . the possibility of a multiplier works to encourage civil rights attorneys to accept difficult cases"). The fact that the client and the attorney privately negotiated a fee arrangement that allocated the risk and reward between them in a way satisfactory to both is not, in itself, a factor that justifies multiplying the lodestar.

¶94 The award of attorney fees must be reversed and remanded to enter a new judgment for attorney fees in the amount of the lodestar with no upward adjustment.

¶95 Whether the lodestar amount itself needs to be recalculated is a separate issue. The trial court's findings supporting the award of attorney fees identify the declarations the court reviewed, which are in the record. The detailed billings examined by the trial court in camera are not, however, included in the record on appeal. The court simply noted that it had reviewed "the Detail Fee Transaction File which set forth the times and work performed by each billing attorney/paralegal commencing February 9, 2009 through January 14, 2011." Based on its review, the

court calculated the total of Westlake's reasonable hourly attorney fees at $110,000.00, a reduction from Westlake's requested amount of $123,073.50.

¶96 Engstrom contends the court abused its discretion by conducting an in camera review of Westlake's detailed attorney fees invoices without ordering Westlake to produce detailed fee records for Engstrom's review. Engstrom objects that the one-page summaries provided by Westlake's counsel do not provide the detail required by *Bowers*, without which Engstrom did not have a foundation from which to argue that the claimed hours should be discounted because of time "spent on unsuccessful claims, duplicated effort, or otherwise unproductive time." *Bowers*, 100 Wn.2d at 597.

¶97 Westlake responds that Engstrom was not entitled to review the Detail Fee Transaction File because the information therein was protected by the attorney-client privilege and the work product doctrine. Westlake contends the summaries were sufficient under *Bowers*.

¶98 The determination of a fee award should not become an unduly burdensome proceeding for the court or the parties. *Absher Constr. Co. v. Kent Sch. Dist. No. 415*, 79 Wn. App. 841, 848, 917 P.2d 1086 (1995). Documentation "need not be exhaustive or in minute detail, but must inform the court, in addition to the number of hours worked, of the type of work performed and the category of attorney who performed the work (*i.e.*, senior partner, associate, etc.)." *Bowers*, 100 Wn.2d at 597. Westlake's list of the total hours expended by each timekeeper does not come up to the standard set in *Bowers* because it does not distinguish among the tasks accomplished during the hours claimed. Without access to such basic information, Engstrom had no hope of critiquing the request in a meaningful way. Westlake's response that the billings contained privileged information cannot serve as a final answer to this problem. Privileged information could have been redacted or a more detailed summary could have been prepared.

¶99 The rule is well settled that the absence of an adequate record upon which to review a fee award will result in a remand of the award to the trial court to develop such a record. *Mahler*, 135 Wn.2d at 435. The appellate courts exercise a supervisory role to ensure that discretion is exercised on articulable grounds. *Mahler*, 135 Wn.2d at 434-35. The burden of demonstrating that a fee is reasonable always remains on the fee applicant. *Absher Constr.*, 79 Wn. App. at 847.

¶100 Westlake has not carried its burden of demonstrating that the lodestar fee was reasonable. We remand for more complete findings, recalculation of the lodestar, and creation of a publicly available record supported by a more detailed summary of the law firm's billings in accordance with the minimum requirements set forth in *Bowers*. To the extent the trial court finds it necessary to review fee records in camera, a practice we do not encourage, those records shall be preserved in a manner permitting designation for appellate review.

## ATTORNEY FEES ON APPEAL

¶101 Both parties seek an award of attorney fees on appeal. Section 10(c) of the agreement provides for attorney fees to the prevailing party in a suit to enforce the terms of the agreement "in any such action, on trial and/or appeal."

¶102 Westlake is the clearly prevailing party. We have affirmed the trial court's judgment for damages in excess of one million dollars. We remand for reconsideration of the attorney fees awarded at trial. Westlake is entitled to its reasonable attorney fees and costs on appeal, which shall be determined by the trial court on remand.

¶103 The judgment is affirmed. The award of attorney fees is reversed.

SPEARMAN, A.C.J., and APPELWICK, J., concur.