[No. 23108.   Department One.   July 30, 1931.]

JOHN A. PEABODY, *Appellant,* v. PIONEER SAND AND
GRAVEL COMPANY, *Respondent.*[1]

[1]Reported in 2 P. (2d) 714.

*James R. Chambers,* for appellant.

*McMicken, Ramsey, Rupp & Schweppe,* for respondent.

PARKER, J.—In November, 1928, the plaintiff, Peabody, commenced this action in the superior court for King county, seeking recovery of a money judgment against the defendant company. Peabody, in his fourth amended complaint, upon which the cause proceeded to trial, alleged his cause of action as follows:

"I. That the defendant now is, and at all times hereinafter mentioned, was a corporation duly organized and existing under and by virtue of the laws of the state of Washington.

"II. That prior to the month of September, 1924, the plaintiff, being an expert in mixing and handling of concrete, originated, created and brought about a special method or system for mixing concrete by using a longer time in the mixing process and smaller amount of water, and with the proper system of control of the said water and the said mixing system, so that concrete which, prior to that time, had to be mixed close to a job of work where the concrete was being put in place, could, by his method so created, discovered and brought about, be mixed at a central station, put into trucks or other containers, transported to a job where the concrete was being put in place, and could successfully and expeditiously and economically be handled in this manner and with a great deal of convenience to the building trade.

"III. That said process was named 'TRU-MIX' by the plaintiff.

"IV. That said system and said Tru-Mix operation was a secret one and unknown to the building trades or building operations or others, and was wholly unknown to the defendant corporation.

"V. That in the month of September, 1924, the defendant corporation was engaged in the sand and gravel business and was desirous, in connection therewith, of entering into the concrete business for general building and other purposes.

"VI. That in the month of September, 1924, aforesaid, the defendant, by and through H. F. Ostrander, its president and general manager, and the plaintiff mutually and orally agreed as follows:

"That the plaintiff should devote his time, expert knowledge, skill and attention to a branch of the defendant's business, which would be created and brought about for the purpose of creating and developing a concrete business for the manufacture, sale and delivery of the said 'Tru-Mix' method aforesaid, which the said defendant was to finance and pay for.

"That plaintiff was to instruct the defendant and its employees in the said method or system, to supervise the said business in conjunction with the said defendant's employees and affairs, and the defendant was to pay the plaintiff the sum of Two Hundred Fifty Dollars ($250.00) per month, until the said business had paid for itself as hereinafter mentioned, and in addition thereto agreed that the plaintiff was to have and own an undivided one-third (⅓) interest in and to the said business, and its profits and its property, the said one-third (⅓) interest to be paid for as to its actual cost, out of the profits made therein; that the contract and interest of the plaintiff herein mentioned was to apply to any and all business or businesses of every kind and character established by the defendant, touching the said Tru-Mix and the defendant agreed not to engage in any part of the same, except in connection with the plaintiff.

"VII. That under and by virtue of the said contract the plaintiff proceeded and did work with the defendant corporation in the creation of the said business, planned and supervised the installation of one central plant, explained the entire system and the secrets thereof to the defendant and its employees, and the said defendant began a large and lucrative business in the manufacture and sale of the said Tru-Mix concrete, which said business and said relationship

continued down to December 20th, 1925, the said business at that time being a large and lucrative business, and of very great value.

"VIII. That on said last mentioned date, the said defendant repudiated the said contract in its entirety and excluded the plaintiff from said business, any interest therein, or any connection therewith, and since that time, down to the present time, has continued to exclude the plaintiff from said business and refuses him anything in connection therewith, after having obtained from plaintiff the secret knowledge and information necessary to conduct the same; and in violation of said contract has continued to and does continue to conduct said particular business alone; and in addition thereto, the said defendant, in violation of said contract and said agreement, uses the trade mark and name Tru-Mix in advertising the said business throughout the state of Washington as its business, and conducts said business as its own, and will continue so to do.

"IX. That said business has been a tremendous success and has grown to very large proportions, which the defendant conducts in and about the cities of Seattle, Tacoma, Bremerton, Everett, Bellingham, Olympia, Raymond and Longview, and in other places in the state of Washington. That a great deal more than a majority of all building operations, as well as paving in the cities, as well as a considerable portion of the concrete business outside of the cities, is being done by the said Tru-Mix method and by the defendant, through the business aforesaid, secured through this plaintiff. That said business has become very valuable and is now of a value of Nine Hundred Thousand ($900,000.00) Dollars, and because of the defendant excluding plaintiff from his interest therein, plaintiff has lost the benefit of his said bargain and has been damaged in the sum of Three Hundred Thousand ($300,000.00) Dollars.

"And in addition thereto, the plaintiff has likewise lost the benefit of said contract in that he would have received and has been damaged by reason of the loss of one-third ($\frac{1}{3}$) of the profits of said business, over and above the amount necessary to pay for the said

one-third (⅓) interest in the sum of Eighty Five Thousand, Six Hundred Sixty Six ($85,666.00) Dollars and would have received and has likewise been damaged by reason of the failure to receive the said Two Hundred and Fifty ($250.00) Dollars per month in the sum of Nine Thousand ($9,000.00) Dollars.''

His prayer was for a money judgment accordingly.

The company, by its answer, admitted its corporate existence; admitted that it employed Peabody at a salary of $250 per month; admitted that it discharged Peabody on December 20, 1925; admitted that it conducts a ''Tru-Mix'' business in Seattle; and denied all other allegations of the complaint.

Counsel for Peabody, sometime prior to the cause being set for trial, demanded a jury trial and deposited with the clerk of the court the statutory fee therefor. Thereafter, some two weeks before the day the cause was set for trial, counsel for the company moved the court that the cause be tried by the court without a jury, notwithstanding the demand for a jury trial. This motion was rested upon the ground that, because of the necessary accounting problems involved in the cause, it became one of equitable cognizance. This motion was, after argument by respective counsel, granted by the court, and the cause accordingly proceeded to trial upon the merits without a jury.

Upon the close of the evidence introduced in behalf of Peabody, counsel for the company moved ''that the cause be dismissed because there is a total failure of proof of the allegations of the complaint, and that no cause of action has been proven against the defendant.'' This motion, being argued by respective counsel, was by the court granted and judgment rendered accordingly, reading, following appropriate recitals, as follows:

"Now, therefore, it is hereby ordered, adjudged and decreed that the plaintiff's said cause be and the same hereby is dismissed without prejudice."

The court did not make any findings of fact. From this disposition of the cause by the superior court, Peabody has appealed to this court.

Peabody testified as to what we conceive to be the vital particulars of the controversy as follows (we quote from the abstract, the correctness of which is not challenged):

"I have been in business for the last twelve years, principally concrete business, designing sand and gravel plants. . . . The thought occurred to me how inefficient it seemed to take sand and gravel up to the job. . . . I noticed how inefficient it was getting the material into the mixer. . . . The thought occurred to me then, why not haul it to the job straight from bunkers as mixed concrete and not take the material up and dump it on the ground and have considerable wastage. I took it up with different engineers, but didn't have an opportunity to then make a complete demonstration of my theory. . . . We used to mix concrete by hand on a board, and lots of times when we went back for a wheelbarrow of concrete we noticed it had gotten fairly stiff. In order to get that stiff concrete workable again, we would turn it over by hand many times to get workability back into it. That proved to me that if you could mix it long enough a time and with a little amount of water, as little as possible, in order to get the desired workability, that you could haul concrete a considerable distance. . . .

"During the latter part of 1918 I came to Seattle to take it up with the Pioneer Sand and Gravel Company. I was referred to Mr. Ostrander, was told he was the manager or president; that he was the proper man for me to see. He asked me if I had ever seen it done, and I couldn't say that I had. He told me he had never seen it done or heard anything of it. We didn't have a very long talk because it interested him so little. It was a very new idea to him at that time, and to most anyone else—the idea of selling concrete

as a commodity. Prior to that time there had never been anything of this kind in the Puget Sound country. I left Mr. Ostrander with the deal still open when I could come back and convince him. That was in the latter part of 1918. . . . Sometimes I would be out of the city three to six months, and whenever I would be back again would go in and take the matter up with Mr. Ostrander. I never could convince him by merely saying I knew I could do it. He always wanted to see something more substantial and something more definite, that this was a practical business. I got after Mr. Ostrander as often as I thought reasonable not to get him disgusted with having me around and not having anything to show. Along in 1922 I got some literature on a plant that had been started in Illinois. I was pleased to get the literature with reference to it so I could show to other people and show I was not exactly crazy, and I showed it to Mr. Ostrander. . . . I was afraid somebody else might be slipping in there and doing it, so I went to another concern in the latter part of 1922. They would not consider it. . . . I went to Mr. Ostrander again and showed him the evidence I had gotten and all the arguments I could produce showing the jobs that had been done by contractors where they had taken the material to their jobs, some hauls as long as three miles; but that didn't satisfy him. . . . From 1918 down to 1924 I took it up with him a great many times. . . .

"In order to secure myself, being afraid that someone else might put the idea over in the city of Seattle and so as to tie up with a concern like the Pioneer, which would exclude everybody else from doing business in the city because it was the only concern really worth while, I went to Ostrander, proposed that I go into the business and finance the plans myself so as to take away the excuse that he didn't think it could be made a business, and he said he didn't know my circumstances, but didn't think I could finance it. He said, 'You better come on and go in with us,' so I forgot the idea of financing it and went to work on that. Then it was probably six or seven months before I got hold of Ostrander again, when we discussed it more thoroughly, and I told him what I could build plants

for. He said, 'Go ahead and draw up some plans, show me what you think it will cost and give me some estimates on the idea.' This I did. . . . I had told him in one of the meetings earlier in my dealings with him that I didn't come there to ask him for a job, that I wanted to share in the profits of the business, wanted to be in on the business or I didn't want to consider it.

. . .

· "Then [referring to September, 1924] I phoned to Ostrander from the dock to make an appointment. He asked me where I had been; said he had expected me over before this. We made the appointment and I went to his office and he asked me if I still thought I could make a go of this business. I said that I was more sure of it than ever. He said, 'Well, on what basis do you want to go on?' I told him I had made two propositions and I thought it was up to him to make a proposal, and he did, and he made the proposal that I was to be advanced $250 per month, one-third interest in the business and its profits and its property, and I was to get this one-third interest when the profits of the business paid for it. I argued with him about the amount, told him that it was less than I had been getting and he said I should be willing to accept it when they were financing the business and taking chances on something that had not been proved. So I finally agreed to accept that. He agreed to finance the business in its entirety, and the understanding was that this was to cover any other business that the Pioneer might go into of this nature. He asked me to devote all my time, and I agreed to that. It was absolutely understood that I was to have absolute charge of it. Then we went ahead with the business. . . . I went ahead with the erection of the plant and got pretty well under way. Then I took up with Mr. Ostrander the matter of some trade name of the business. I told him the names I had thought of, like 'Thoro-Mix,' 'Tru-Mix,' 'Pre-Mix.' I asked him the name he liked and he said it was up to me and I could call it what I liked. I said 'Tru-Mix' was a good name, and that was the name we decided on. It is the name of the business. . . .

"The benefit and advantage of this central mixing plant over the method that had been used before was the big saving of the difference in cost of mixing the concrete and getting it into a finished product. On construction jobs, the installation cost of a plant just to mix the concrete was practically lost. The bins, runways, ramps that were built, all the timber work that went into the plant on the job—there was no salvage in any of them at all. . . . Take concrete—like mush, for instance, if you put in enough water to get that and haul it eight or nine miles, you will begin to get segregation. By putting in less water you will get that consistency, but it holds the material in suspension in travelling. . . . I had been with this plant, increasing its business for about twelve months, when I took it up with Mr. Ostrander about another plant; that the business needed another plant. He then said he didn't know about it; that we could not make a go of it. I asked him why. He said because I was a hard man to get along with. He just said they were through. . . .

"This is a steel plant sitting on wooden timbers because we did not know but what we would have to move it, and for some reason or another it might not stay there and might not be a permanent business, so we put it on wooden timbers—skids, and sniped the ends, so in moving it it would receive the rollers easy, and that is the way it is today. The Westlake plant was built after our relations were severed, and the Latona plant built after that. [No plant was built prior to the severing of their relations other than the one Peabody testified to as having been constructed and operated under his management.] . . . The arrangement that I made with the Pioneer Sand and Gravel Company through Mr. Ostrander September, 1924, was made all in one interview. . . ."

The accounting evidence, consisting of the testimony of a certified public accountant and his compiled statements made from the voluminous book entries of the company, showed profits of a substantial amount from

the "Tru-Mix" operations of the company during the year 1925; that is, during the period of the operation of the first constructed plant up to the time the relations of Peabody with the company were severed. This accounting evidence also showed profits of that business for the years 1926, 1927, 1928 and 1929, and the first half of 1930. The fourth amended complaint was served September 9, 1930, and the trial was commenced October 20, 1930. Ostrander, at all times in question, was the president and general manager of the company's business, and also owned the controlling interest in its capital stock.

We do not understand counsel for Peabody to here contend that there was any failure on the part of the company to pay to him, up to the severance of his relations with the company, the $250 per month, as it is conceded by both parties he was to receive while his relations with the company continued. So, the controversy is over the profits of the business prior to the severance of that relation, over the profits of the business thereafter, and over his claim of $250 per month thereafter.

As we proceed, let it be remembered that this judgment is one of dismissal without prejudice, and that, when we speak of the evidence showing or failing to show any material fact, we mean as the evidence stood at the close of Peabody's case.

We have seen that the trial judge did not make any findings of fact. He did, however, render an oral opinion upon the motion of counsel for the company for dismissal, formally expressing his views why there was an entire failure of proof of Peabody's right of recovery. There was thus expressed the trial judge's view that there was such failure of proof because the

evidence showed that there was no secret process in the exclusive possession of Peabody of such nature that he was entitled to compensation for merely communicating it to the company.

We agree with the trial judge to the extent that the proof failed to show that Peabody possessed any secret process. Peabody's own testimony shows that, while he had thought of the fact that, if concrete were properly mixed at a permanently, properly equipped plant, it would be capable of being transported some considerable distance without incurring such deterioration as to render it unsuitable for use following such transportation, yet, that idea had been thought of and put in practice successfully in some substantial measure by others prior to the time of Peabody's entering into the contract with the company.

But it seems to us that the failure of proof in this respect did not, of itself, constitute failure of proof of Peabody's right of recovery against the company. The proof showed that the contract was performed on the part of Peabody, by his doing all that he agreed to do. Ostrander, the president and general manager of the company, knew that the process was not a secret one when he entered into the contract for the company with Peabody. This was communicated to Ostrander by what Peabody told him before the contract was made. So, it seems plain to us that the company was not dealing with Peabody on the faith of his communicating to it any secret process that it could use to the exclusion of others.

The proof convincingly showed that the contract was made substantially as pleaded and testified to by Peabody, and was carried out successfully in its performance by Peabody up to the time of the severing of his relations with the company, by its declaration and elec-

tion through Ostrander, its president and general manager. So, we think Peabody was shown to be entitled to recovery from the company in some substantial measure, unless there be some other reason for denying him relief, as to which we shall now inquire.

■ It is contended in behalf of the company that the contract, not being in writing, falls under the ban of our statute of frauds, in that it was, by its terms, not to be performed within one year after its making. It is plain that the contract did not contemplate any fixed period of performance. The contractual relation, however it may be characterized, manifestly contemplated an indefinitely continuing relation of the parties. Viewed as a contract establishing a relation in the nature of a partnership or joint adventure having no agreed time for termination, it was manifestly terminable at the will of either party at any time within a year or at any time thereafter. Viewed as an employment contractual relation between the parties for an indefinite time, of course, it might also be terminable within or beyond a year's duration at the will of either party. Since the time of termination did not necessarily extend beyond one year, the contract did not fall under the ban of the statute of frauds. 20 R. C. L. 954; 25 R. C. L. 454; 27 C. J. 187; *Seeley v. Morris,* 137 Wash. 274, 242 Pac. 359; *Dent Lumber & Shingle Co. v. Cedarhome Lumber Co.,* 141 Wash. 593, 252 Pac. 141.

■ It is contended in behalf of the company that the contract, not being in writing, falls within the ban of our statute of frauds because it looks to the transfer of real property from the company to Peabody. We do not find that the contract, either as pleaded or proven, contemplates any transfer of title by the company to Peabody of real property; nor, as so evi-

denced, does it even contemplate the acquisition of any real property jointly by Peabody and the company. Looking to the proof of what was done under the contract, and treating that as a practical construction of it as to the nature of the property to be acquired thereunder, it is plain that the plant, constructed and operated under Peabody's supervision before the severing of his relation with the company, was constructed with the evident purpose and intent that it should not become a part of the soil, but with the purpose and intent that it should remain as property independent of the soil, and capable of being removed therefrom without any injury to the soil.

Contention is made in behalf of the company that Ostrander, as president and general manager of the company, was not authorized to enter into the contract and so bind the company. We have seen that he was the president and general manager of the company and the owner of a controlling interest in the capital stock thereof; that the company has received, in the form of profits, the benefit of Peabody's skilled services in constructing and operating its plant while his relation with it continued. It seems to us that, in so far as the company has taken and retained such fruit of his services, it should not now be heard to say that there was any want of authority in Ostrander to enter into the contract to the end that it may now keep what it has so acquired.

It is contended in behalf of Peabody that the trial court erred in refusing to award him a jury trial. The argument seems to rest upon the theory that the action is one seeking recovery of damages only to be compensated by a money judgment. It is true that only a money judgment is asked, but that, of itself, is of no substantial controlling force here, as we view the real nature of this action. The right determination of this

action, it seems to us, plainly calls for an accounting between Peabody and the company touching the profits of the business and Peabody's interest therein. This is not a case of Peabody's suing merely for recovery of salary or for damages for loss of salary, by reason of wrongful discharge. While he seeks a money judgment against the company, he is, to that end, necessarily seeking an accounting from the company for profits which it, in a sense, holds in trust for him. We are of the opinion that whatever doubt there may have been as to the cause being of equitable cognizance as for an accounting when the trial court decided it to be such upon the pleadings before the trial, that doubt has been removed by what has been made to appear upon the trial. We conclude that the court correctly held that the cause was triable as of equitable cognizance.

It appears, as the proof stood at the close of the evidence introduced in behalf of Peabody, that there had been profits of very substantial amount earned by the business during the year 1925 up to December 20, 1925, when the relations of the parties were severed. It seems plain to us, as the evidence now stands, that Peabody is entitled to share in those profits in accordance with the terms of the contract between him and the company, and the company is liable to him for an accounting and for the amount thereof, unless, upon further evidence which may be introduced in behalf of the company, it be proved otherwise. We are not deciding as to what his rights in that behalf may be when the case is fully tried and submitted for final decision upon the merits upon the part of the company as well as Peabody.

We conclude that the judgment must be reversed, and the cause remanded to the superior court for further trial; whether for an entirely new trial or for further trial consisting of the use of the evidence al-

ready introduced in behalf of Peabody and the taking of such further evidence as may be offered in behalf of the respective parties, we leave for determination by the superior court. It is so ordered.

TOLMAN, C. J., MAIN, MITCHELL, and HOLCOMB, JJ., concur.

