

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

| | | |
|---|---|---|
| LUCAS PRICE, an individual, | ) | No. 75847-1-I |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | UNPUBLISHED OPINION |
| DANIEL PRICE, an individual, | ) | |
| | ) | FILED: April 30, 2018 |
| Respondent. | ) | |

VERELLEN, J. — Lucas Price, a minority shareholder, director, and founder of Gravity Payments, Inc., appeals a judgment rejecting his claims against the majority shareholder, Daniel Price.

Lucas challenges the court's decision to strike his jury demand. Because the trial court properly applied the factors from Brown v. Safeway Stores, Inc.,[1] the trial court did not abuse its discretion when it determined the action was primarily equitable and struck Lucas's jury demand.

Following the bench trial, the trial court found Lucas failed to prove his claims of (1) minority shareholder oppression, (2) breach of fiduciary duty, and (3) breach of the shareholders agreement. Because the evidence is sufficient to

---

[1] 94 Wn.2d 359, 617 P.2d 704 (1980).

support the court's findings and those findings support the court's conclusions, the trial court did not err.

Lucas also challenges the award of attorney fees and costs to Daniel, the postjudgment interest rate, and various trial management decisions. The trial court did not abuse its discretion in any of these areas.

Therefore, we affirm.

## FACTS

In 2004, brothers Lucas and Daniel formed Price & Price, LLC, a credit card processing services company. Shortly after they formed the company, Daniel and Lucas divided ownership 50/50.

In 2008, Lucas and Daniel restructured the company into Gravity Payments, Inc., a closely-held corporation. They executed a series of agreements, including employment agreements for each brother and a shareholders agreement. As part of the restructuring, Gravity redeemed 20,000 shares from Lucas, reducing his ownership interest to 40 percent.

Lucas filed this lawsuit in 2015 and brought four claims: (1) minority shareholder oppression, (2) breach of fiduciary duty, (3) breach of Daniel's employment agreement and the shareholders agreement, and (4) general equitable relief.

On January 22, 2016, Lucas filed a jury demand. On February 22, 2016, the court dismissed Lucas's cause of action for general equitable relief and his

claim for breach of the employment agreement. On May 26, 2016, the court struck Lucas's jury demand.

At the start of the bench trial, the court denied Lucas's motion to exclude Daniel's calendar. During trial, the court limited Lucas's cumulative cross-examination of Daniel's forensic accounting expert.

The trial court ultimately found Lucas failed to prove any of his remaining claims and dismissed the action with prejudice. The court also awarded $1,324,941.61 in fees and costs to Daniel. And the court imposed a postjudgment interest rate of 12 percent on the fee award.

Lucas appeals.

## ANALYSIS

### I. Jury Demand

Lucas contends the trial court abused its discretion when it struck his jury demand.

We review a trial court's decision to strike a jury demand for abuse of discretion.[2] In a civil case, there is a right to a jury trial when the action is purely legal in nature but not when it is purely equitable.[3] "The overall nature of the action is determined by considering all the issues raised by all of the pleadings."[4] In making this determination, the trial court should consider:

---

[2] Dep't of Nat. Res. v. Littlejohn Logging, Inc., 60 Wn. App. 671, 673, 806 P.2d 779 (1991) (citing Brown, 94 Wn.2d at 368).

[3] Brown, 94 Wn.2d at 365.

[4] Id.

3

"(1) who seeks the equitable relief; (2) is the person seeking the equitable relief also demanding trial of the issues to the jury; (3) are the main issues primarily legal or equitable in their nature; (4) do the equitable issues present complexities in the trial which will affect the orderly determination of such issues by a jury; (5) are the equitable and legal issues easily separable; (6) in the exercise of such discretion, great weight should be given to the constitutional right of trial by jury and if the nature of the action is doubtful, a jury trial should be allowed; (7) the trial court should go beyond the pleadings to ascertain the real issues in dispute before making the determination as to whether or not a jury trial should be granted on all or part of such issues."[5]

Here, the court identified, "Lucas is the party seeking equitable relief and is the party demanding a jury."[6]

At the time of trial, Lucas had three claims: (1) minority shareholder oppression, (2) breach of fiduciary duty, and (3) breach of contract under the shareholders agreement. Lucas sought an accounting, court-ordered buyout, any other "equitable remedies as the Court deems just and appropriate," damages, and attorney fees.[7]

The trial court concluded, "Lucas primar[ily] seeks an equitable remedy in this action, though monetary damages are sought as well. Lucas's claim for minority oppression is equitable in nature. His claim for breach of fiduciary duty involves many of the same issues as the oppression claim and is primarily equitable in nature."[8]

---

[5] Id. at 368 (quoting Scavenius v. Manchester Port Dist., 2 Wn. App. 126, 129-30, 467 P.2d 372 (1970)).

[6] Clerk's Papers (CP) at 860 (Conclusion of Law 14).

[7] CP at 4.

[8] CP at 860 (Conclusion of Law 15).

During oral argument before this court, Lucas focused on <u>Allard v. Pacific National Bank</u> to argue his claim for breach of fiduciary duty is legal in nature.[9] In <u>Allard</u>, our Supreme Court considered whether the beneficiaries of a trust had a right to a jury trial in a suit for breach of fiduciary duty against the trustee.[10] The court recognized "[w]here the beneficiaries seek recovery for themselves personally, the action is considered legal in nature."[11] Here, as to Lucas's claim that Daniel breached his fiduciary duty when he improperly charged personal expenses to the company, Lucas sought recovery based on his share of ownership.[12]

But the centerpiece of the lawsuit was Lucas's minority oppression claim and request for a court-ordered buyout. An accounting and a court-ordered buyout are equitable remedies.[13] And a claim of minority shareholder oppression

---

[9] 99 Wn.2d 394, 663 P.2d 104 (1983).

[10] <u>Id.</u> at 395.

[11] <u>Id.</u> at 400.

[12] <u>See</u> Appellant's Br. at 51 ("Lucas is a 32.5 percent shareholder in Gravity. Thus, for every dollar Daniel spent of Gravity's money for his own personal expenses, approximately one-third was direct damage to Lucas.").

[13] <u>See</u> <u>Jackson v. Gardner</u>, 197 Wash. 276, 283-84, 84 P.2d 992 (1938) ("Manifestly the right of the parties could not be determined except by taking an accounting between them, and, as the transactions appeared by the pleadings to be extensive and varied, it necessarily involved a long and complicated accounting. It has long been the rule that these conditions alone justified the assumption of jurisdiction by a court of equity."); <u>Peabody v. Pioneer Sand & Gravel Co.</u>, 164 Wash. 26, 39, 2 P.2d 714 (1931); <u>Garey v. City of Pasco</u>, 89 Wash. 382, 383-84, 154 P. 433 (1916) ("an action for an accounting, properly maintainable as such, is one of equitable cognizance"); <u>Auburn Mech., Inc. v. Lydig Constr., Inc.</u>, 89 Wn. App. 893, 902, 951 P.2d 311 (1998) (a coercive order is within the court's equitable power).

under RCW 23B.14.300 is an equitable claim.[14] "When both law and equity issues exist in a lawsuit, a trial court has wide discretion in granting or denying a jury trial."[15] Notably, in Whatcom County v. Reynolds,[16] this court determined "[a]ctions involving fiduciary relationships that seek accountings and imposition of constructive trusts are invariably equitable."[17] Here, as recognized by the trial court, "[h]is claim for breach of fiduciary duty involves many of the same issues as the oppression claim and is primarily equitable in nature."[18]

Although money damages are a legal remedy and breach of contract is a legal claim,[19] the trial court recognized, "[t]he equitable issues present complexities that would affect the orderly determination of any legal issues by the jury.[20] And the court acknowledged, "[b]oth the claims and the relief are so interrelated that they cannot easily be separated between the court and a jury."[21]

---

[14] See Scott v. Trans-Sys., 148 Wn.2d 701, 716-17, 64 P.3d 1 (2003) ("Dissolution suits under Washington's dissolution statute are fundamentally equitable in nature.").

[15] Batten v. Abrams, 28 Wn. App. 737, 743, 626 P.2d 984 (1981).

[16] 27 Wn. App. 880, 620 P.2d 544 (1980).

[17] Id. at 882.

[18] CP at 860.

[19] S.P.C.S., Inc. v. Lockheed Shipbuilding and Constr. Co, 29 Wn. App. 930, 934, 631 P.2d 999 (1981) ("The court has been called upon to construe a contract, determine if a breach has occurred, and determine what damages, if any, flow therefrom. It is well settled that these are legal issues."); Auburn Mech., 89 Wn. App. at 901 ("Money damages is exactly the remedy juries traditionally determine."); but see S.P.C.S., Inc., 29 Wn. App. at 934 ("even if the action is one for money damages, it may be primarily equitable in nature").

[20] CP at 860 (Conclusion of Law 17).

[21] Id. (Conclusion of Law 16).

The record adequately supports the trial court's determination that Lucas primarily sought equitable remedies not easily separated between the court and a jury.

Lucas also claims the trial court's decision to strike the jury demand was improperly influenced by scheduling concerns. Shortly before trial, Lucas's counsel e-mailed the court to express concern about the number of days reserved for the trial. The court responded by attaching the order granting the motion to strike the jury and stating, "Thus, there is now an additional day for trial."[22] Contrary to Lucas's argument, the email exchange does not imply the trial court struck Lucas's jury demand in order to accommodate scheduling concerns.

Because the trial court properly applied the Brown factors consistent with the record and our case law, we conclude the trial court did not abuse its discretion when it struck Lucas's jury demand.

## II. Shareholder Oppression, Breach of Fiduciary Duty, and Breach of Contract

Lucas assigns error to the court's findings that he failed to prove his claims of shareholder oppression, breach of contract, and breach of fiduciary duty.

Review of a trial court's findings of fact and conclusions of law is "limited to determining whether the trial court's findings are supported by substantial evidence in the record and, if so, whether the conclusions of law are supported by those findings of fact."[23]

---

[22] CP at 1719.
[23] Scott, 148 Wn.2d at 708.

The business judgment rule applies to all of Lucas's claims.[24] Generally, "[c]ourts are reluctant to interfere with the internal management of corporations" and "refuse to substitute their judgment for that of the directors."[25] Specifically, the business judgment rule "immunizes management from liability in a corporate transaction undertaken within the corporation's power and management's authority where a reasonable basis exists to indicate that the transaction was made in good faith."[26] Corporate officers do not have immunity when they act "in bad faith and with a corrupt motive."[27]

Washington's corporation dissolution statute, RCW 23B.14.300(2)(b), permits equitable relief if "[t]he directors or those in control of the corporation have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent."

Washington courts have established two tests to define oppressive conduct. "The first, called the 'reasonable expectations' test, defines oppression as a violation by the majority of the reasonable expectations of the minority."[28] "It is the minority shareholder's burden to show oppressive conduct before the burden shifts to the majority shareholders to establish legitimate business justifications for the

---

[24] See Para-Medical Leasing, Inc. v. Hangen, 48 Wn. App. 389, 396, 739 P.2d 717 (1987) (the business judgment rule applies when "considering the actions of a corporate officer").

[25] Nursing Home Bldg. Corp. v. DeHart, 13 Wn. App. 489, 498, 535 P.2d 137 (1975).

[26] Interlake Porsche & Audi, Inc. v. Bucholz, 45 Wn. App. 502, 509, 728 P.2d 597 (1986).

[27] Id.

[28] Scott, 148 Wn.2d at 711.

conduct."[29] "'Reasonable expectations' are those spoken and unspoken understandings on which the founders of a venture rely when commencing the venture."[30]

"Application of the reasonable expectations test is most appropriate in situations where the complaining shareholder was one of the original participants in the venture—one who would have committed capital and resources."[31]

The second oppression test is defined as

"burdensome, harsh and wrongful conduct; a lack of probity and fair dealing in the affairs of the company to the prejudice of some of its members; or a visible departure from the standards of fair dealing, and a violation of fair play on which every shareholder who entrusts his money to a company is entitled to rely."[32]

This test is applied when application of the reasonable expectations test is not straightforward. In Scott v. Trans-System, Inc., our Supreme Court determined the reasonable expectations test should not be applied when "there is no indication in the record as to what the reasonable expectations of the parties were or whether [the complaining shareholder] invested any of his own money to facilitate the incorporation and development of [the company]."[33]

---

[29] McCormick v. Dunn & Black, P.S., 140 Wn. App. 873, 889, 167 P.3d 610 (2007) (citing id. at 709).

[30] Scott, 148 Wn.2d at 711.

[31] Id.

[32] Id. (quoting Roblee v. Roblee, 68 Wn. App. 69, 76, 841 P.2d 1289 (1992)).

[33] Id. at 712.

"These two tests are not mutually exclusive and one or both may be used in the same case, depending on the facts."[34] "Under both tests, the complaining shareholder has the burden of proof, by a preponderance of the evidence, to establish the requisite jurisdictional facts and the equitable grounds for dissolution."[35]

As a threshold matter, the court properly applied the reasonable expectations test because Lucas and Daniel co-founded Gravity and there is evidence in the record as to their reasonable expectations.[36]

To support his claim that Daniel breached his fiduciary duty, Lucas must show "(1) that a shareholder breached his fiduciary duty to the corporation, and (2) that the breach was a proximate cause of the losses sustained."[37] A claim of minority shareholder oppression is closely related to a claim that the majority shareholder breached his or her fiduciary duty.[38]

"Once the breach of fiduciary duty has been established, the plaintiff must prove the damage resulting from the breach."[39] "Damages must be supported by competent evidence in the record; however, evidence of damages is sufficient if it

---

[34] Id. at 711.

[35] Id. at 712.

[36] See CP at 920 ("Where, as here, the dispute is between corporate founders, the 'reasonable expectations' test applies.") (Conclusion of Law 8).

[37] McCormick, 140 Wn. App. at 894 (citing Interlake Porsche, 45 Wn. App. at 509).

[38] Scott, 148 Wn.2d at 711.

[39] Interlake Porsche, 45 Wn. App. at 510.

affords a reasonable basis for estimating the loss and does not subject the trier of fact to mere speculation or conjecture."[40]

To show breach of contract, Lucas must prove duty, breach, causation, and damages.[41] "There is in every contract an implied duty of good faith and fair dealing."[42] Here, section 6.1.1 of the shareholders agreement also imposes an obligation of good faith and fair dealing to the board's decisions related to Daniel's salary and bonuses. The court correctly concluded this section was "not intended to impose a separate duty . . . because the duty to exercise good faith and fair dealing is inherent in every contract."[43]

We apply the shareholder oppression reasonable expectations test, breach of fiduciary duty standard, and breach of contract theory to the three central disputes in this litigation.

A. *2012 Stock Award*

Under section 6.4.1 of the shareholders agreement, "Daniel Price shall receive an annual stock award" based on the "Year Closing Value."[44] The "Year Closing Value" is determined by "a *valuation* of the Corporation . . . by a qualified appraiser."[45] Sufficient evidence supports the finding that "[t]he Shareholders

---

[40] Id. (citation omitted).

[41] Baldwin v. Silver, 165 Wn. App. 463, 473, 269 P.3d 284 (2011).

[42] Badgett v. Sec. State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991).

[43] CP at 931 (Conclusion of Law 34).

[44] Ex. 11 at 29-30.

[45] Ex. 11 at 30 (emphasis added).

Agreement provided for an annual stock award to Daniel Price based on the growth of the company."[46]

In late 2012, Daniel asked Clothier and Head, Gravity's accounting firm, to perform a valuation for 2011 and 2012 to determine the amount of Daniel's stock grant for those years. Mark Mitchell performed the appraisal.

Daniel repeatedly told Mitchell that he wanted the appraisal to be independent. When Mitchell requested "written projections or estimates of future growth," Daniel refused to provide such documentation because he wanted the report to be completed "without the inside information, so that the report can stand on its own more."[47] The record supports the finding that Daniel "intended that Mitchell would do the work independently and without manipulation from shareholders."[48]

At trial, Lucas's primary challenge to the stock award was that Daniel improperly manipulated the appraisal by "put[ting] his thumb on the scale in order to make the 2011 appraisal lower and the 2012 appraisal higher so that there would be as big of a difference as possible between the two so that he could get a larger stock award."[49]

After Lucas expressed his concern, Daniel facilitated a meeting between Lucas and Mitchell to discuss Mitchell's draft appraisal. At the meeting, Lucas

---

[46] CP at 909 (Finding of Fact 26).

[47] RP (June 8, 2016) at 192.

[48] CP at 909 (Finding of Fact 27).

[49] RP (June 1, 2016) at 365.

12

proposed a different growth rate than the one contained in the draft. Daniel testified at trial that he did not believe it was appropriate for either himself or Lucas to present growth rates. Daniel reiterated he was "looking for the appraiser to reach his own independent judgment about what the applicable growth rate should be."[50] Sufficient evidence supports the court finding that Daniel refused to provide growth projections and "insist[ed] that the appraisal must be independent."[51]

Based on the draft appraisal, the board approved a 2012 stock award to Daniel in March 2013. Mitchell characterized the draft appraisal as a "valuation." After the board relied on the appraisal and unanimously approved the stock award, Mitchell reframed the appraisal as a "calculation." Daniel testified that Mitchell did not tell him about the language changes and that he did not learn about the changes until trial.

During one of two telephone conversations, Daniel did tell Mitchell that his "goal" for the company was "35 to 40 percent growth in 2013."[52] But Daniel did not discuss his goals for 2011 or 2012, the applicable years for Mitchell's appraisal. The record supports the findings that Daniel did not provide projected growth rates for 2011 or 2012 and that "[t]here is no evidence that anything Daniel Price said to Mitchell . . was incorrect or intended to manipulate the appraisal."[53]

---

[50] RP (June 8, 2016) at 202-03.

[51] CP at 909 (Finding of Fact 27).

[52] RP (June 8, 2016) at 194-95.

[53] CP at 910 (Finding of Fact 29).

Further, Mitchell based the appraisal on a discounted cash flow analysis and a separate market comparable analysis. Lucas's complaint of manipulation due to Daniel allegedly providing projected growth rates applies only to the discounted cash flow analysis. Sufficient evidence supports the court's finding that "Lucas Price's claim that Daniel Price manipulated the valuation reports by influencing the growth rates used in those reports relates only to the discounted cash flow analysis. Lucas Price did not contest the market comparable analysis."[54]

The record supports the court's findings, and these findings support the court's conclusions that the 2012 stock grant did not constitute shareholder oppression, breach of fiduciary duty, or breach of contract.[55]

## B. Personal Expenses

A fiduciary is "liable only for those expenditures of corporate funds that were shown to have been for his personal benefit."[56] "[W]here a transaction

---

[54] CP at 912 (Finding of Fact 38).

[55] Lucas claims that although Daniel "represented to the court that he was going to call a meeting to review the improper stock award[,] . . . Daniel has done nothing." Appellant's Br. at 47. But the announcement by defense counsel of Daniel's intent to call a board meeting to address what to do about the form change from a "valuation" to a "calculation" was not the subject of any finding by the trial court, was not reduced to writing as urged by the court, and does not meaningfully impact any issue on appeal. This appeal is limited to whether sufficient evidence supports the court's findings and whether those findings support the court's conclusions and not whether conduct after the trial is of any significance.

[56] Interlake Porsche, 45 Wn. App. 512.

involves self-dealing or evidence of personal benefit is shown, then the burden shifts to the fiduciary to show good faith."[57]

During trial, the parties disputed the standard for determining an "authorized business expense." Lucas's forensic accounting expert, William Partin, applied IRS documentation guidelines and "totaled the charges lacking proper documentation."[58] Partin found a total of $627,965.08 lacking sufficient documentation.

The shareholders agreement does not discuss payment of personal expenses with corporate assets. But Daniel's employment agreement provides, "Employee shall use any credit card or other authorization to incur costs or expenses in the name of Gravity solely for authorized business expenses of Gravity," and the employment agreement is incorporated into the shareholders agreement by reference.[59] The employment agreement does not define "authorized business expenses."

Daniel testified, "The rules I that follow are from the shareholders agreement. I'll state it somewhat imperfectly, because I don't have it in front of me, that the company expenses should be in line with the IRS guidelines."[60] But Daniel also testified he did not intend to "refer . . . to IRS documentation

---

[57] Id.

[58] CP at 768.

[59] Ex. 10 at 3.

[60] CP at 1734.

standards."[61] Sufficient evidence supports the finding that "[t]here is no evidence that the company conditioned reimbursement on presentation of such IRS documentation."[62]

Daniel testified that well over 90 percent of the expenses were business related. Daniel also testified some of the company credit card expenses were not reimbursed. Sufficient evidence supports the finding that "[t]here was evidence that Daniel Price used the company credit card for expenses that were not subsequently reimbursed."[63]

Daniel's forensic accounting expert, Lorraine Barrick, compared specific expenses with Daniel's calendar to determine whether expenses were personal or business. Barrick testified that the expenses reports showed "the kinds of things that can be incurred by the CEO of a company."[64] The court found "Daniel Price's expert . . . testified that she reviewed . . . Daniel's calendar and was able to determine that many of the disputed expenses were related to a proper business purpose."[65]

Daniel and his expert's testimony provide sufficient evidence to support the court's findings, and these findings support the court's conclusions that Lucas

---

[61] RP (June 1, 2016) at 206.

[62] CP at 905 (Finding of Fact 12).

[63] Id. (Finding of Fact 11).

[64] RP (June 14, 2016) at 652.

[65] CP at 906 (Finding of Fact 12).

failed to show Daniel's credit card expenses constituted shareholder oppression or breach of fiduciary duty.

The court also determined "the breach of contract claim does not include the . . . reimbursement issues" because "[t]he agreement does not address reimbursement, and the duty [of good faith and fair dealing] cannot be used to create any obligation."[66] Even if the contract does apply to the reimbursement claim, sufficient evidence supports the court's finding that Lucas failed to prove Daniel improperly used corporate assets to pay personal expenses.

## C. Daniel's 2013 and 2014 Bonuses

According to section 6.4.3 of the shareholders agreement, "[t]he Corporation (through the Board) is authorized to pay Daniel Price such salary and bonus as it may determine under 6.1.1."[67] Section 6.1.1 grants Daniel the authority to set his compensation if the Board cannot reach consensus.[68] Sufficient evidence supports the court finding that "Daniel Price had the authority

---

[66] CP at 930 (Conclusion of Law 32).

[67] Ex. 11 at 30.

[68] Id. at 27 ("The Board, as so constituted, shall decide all management issues as follows:  If the Board achieves consensus, their consensus decision shall be the decision of the Board.  If they are unable to reach consensus, then the representative of the Founder or his estate, who . . . hold more Shares than the other Founder or his estate . . . shall decide and control the management decision of the Board."); see also RCW 23B.07.320(1)(f) ("An agreement among the shareholders of a corporation. . . is effective . . . even though it is inconsistent with . . . this title in that it . . . [t]ransfers to one or more shareholders . . . all or part of the authority to exercise the corporate powers.).

under the Shareholders Agreement to set his bonus compensation without board consensus."[69]

In March 2013, Daniel and Lucas agreed on a 2012 cash bonus of $800,000 for Daniel in addition to his $300,000 salary. Lucas testified he agreed because Daniel threatened to withhold Lucas's questions for Mitchell about the Clothier and Head valuation. Daniel testified, "I don't think that's true," and presented evidence that he forwarded Lucas's questions to Mitchell shortly after the meeting.[70] And Daniel's lawyer, Jonathan Michaels, who was at the March 20 meeting, testified that the meeting was civil; "[t]here was no table pounding or name calling or threats or anything of that sort."[71] Sufficient evidence supports the court finding that the March 2013 board meeting was "civil and cordial and there were no threats."[72]

In 2013 and 2014, Daniel and Lucas could no longer agree as to Daniel's bonus. In late 2012, Lucas proposed setting Daniel's 2013 bonus at $200,000, despite Gravity's significant year over year growth. Shortly thereafter, communication between Lucas and Daniel began to break down. Lucas argues Daniel did not establish a lack of consensus, but there was adequate evidence of an impasse to support Daniel's invocation of section 6.1.1 of the shareholders agreement.

---

[69] CP at 915 (Finding of Fact 48).

[70] RP (June 9, 2016) at 382.

[71] RP (June 13, 2016) at 493.

[72] CP at 908-09 (Finding of Fact 25).

In early 2014, Lucas and Daniel agreed to hire an executive compensation consultant to advise on the bonus dispute. Daniel selected Towers Watson.

Daniel testified that he did not have "any material role" in gathering information for Towers Watson.[73] He also testified that he instructed Emery Wager, a Gravity employee, "[t]o communicate everything to Lucas, to not hold anything back, and to make sure he was fully informed, answer his questions, and try to fulfill any requests that he could."[74] And Daniel testified that he wanted the report to be "independent and credible" and he tried to avoid influencing their work.[75] The record supports the finding that "Daniel Price intended that Towers Watson's report would be independent and he had very little involvement in their work."[76]

In the report dated April 17, 2015, Towers Watson determined the appropriate bonus range for Daniel was between $75,000 and $500,000, with the appropriate total compensation between $675,000 and $2.8 million. In the report, the total compensation was comprised of salary, bonus, and long term compensation.

Eventually, Daniel unilaterally set his bonuses for 2013 and 2014 at $800,000. His salary remained $300,000, for a combined total compensation of $1.1 million each year. Sufficient evidence supports the findings that (1) "Daniel

---

[73] RP (June 9, 2016) at 255.

[74] Id. at 256.

[75] Id. at 257.

[76] CP at 913 (Finding of Fact 42).

Price's compensation for 2013 and 2014 is within Towers Watson's range of reasonable compensation for the CEO of Gravity Payments" and (2) "[t]he Towers Watson report corroborated the reasonableness of Daniel Price's compensation."[77] Even though Lucas provided some evidence questioning the Towers Watson analysis, other evidence supported it.

We conclude the record supports the court's findings, and these findings support the court's conclusions that the 2013 and 2014 bonuses did not constitute shareholder oppression, breach of fiduciary duty, or breach of contract.

### III. Limitation of Cross-Examination

Lucas argues the trial court abused its discretion when it terminated his cross-examination of Lorraine Barrick, Daniel's forensic accounting expert.

"The scope of cross-examination is within the discretion of the trial court."[78] "Similarly, the admissibility of cumulative evidence lies within the trial court's discretion."[79]

On cross-examination, Lucas attempted to elicit testimony from Barrick about specific days when Daniel charged "business" expenses to Gravity and his calendar did not show a corresponding entry. Daniel objected that the testimony was cumulative, and the court agreed because the expense reports and Daniel's calendar were "already before the court."[80]

---

[77] CP at 915-16 (Findings of Fact 48 and 50).

[78] Thornton v. Annest, 19 Wn. App. 174, 180, 574 P.2d 1199 (1978).

[79] Christensen v. Munsen, 123 Wn.2d 234, 241, 867 P.2d 626 (1994).

[80] RP (June 14, 2016) at 728.

Lucas argues the limits on his cross-examination excluded evidence establishing his claim that Daniel misused corporate assets. But the testimony he was attempting to elicit did not provide the court with any new information.

We conclude the trial court did not abuse its discretion when it terminated Lucas's cross-examination of Daniel's expert witness.

### IV. Denial of Lucas's Motion to Exclude

Lucas argues the trial court abused its discretion when it denied his motion to exclude Daniel's calendar.

In order to exclude evidence for a discovery violation, the court must consider (1) "'whether a lesser sanction would probably have sufficed,'" (2) "whether . . . the disobedient party's refusal to obey a discovery order was willful or deliberate," and (3) whether the violation "substantially prejudiced the opponent's ability to prepare for trial."[81]

On May 19, 2016, Lucas deposed Barrick. She testified to reviewing Daniel's entire calendar, from 2008 to present, to prepare her report. Barrick brought the calendar and her other files to the deposition. On May 25, 2016, Lucas moved to exclude Daniel's calendar because Daniel did not provide his calendar until Barrick's deposition even though it was responsive to several earlier

---

[81] Burnet v. Spokane Ambulance, 131 Wn.2d 484, 494, 933 P.2d 1036 (1997) (quoting Snedigar v. Hodderson, 53 Wn. App. 476, 487, 768 P.2d 1 (1989), rev'd in part, 114 Wn.2d 153, 786 P.2d 781 (1990)).

discovery requests. On May 31, 2016, the court denied Lucas's motion to exclude.

Lucas does not establish the late disclosure substantially prejudiced his ability to prepare for trial. He argues he was prejudiced because his experts were unable "to develop a comprehensive responsive analysis of the calendar,"[82] but makes no showing that his theory of the case required such an analysis. The theory underlying Lucas's claim that Daniel misused corporate assets was that Daniel failed to document his expenses per IRS guidelines.

We conclude the trial court did not abuse its discretion when it denied Lucas's motion to exclude Daniel's calendar.

## V. Attorney Fees and Costs

Lucas contends the trial court abused its discretion when it awarded attorney fees and costs to Daniel.

We review a trial court's determination of reasonableness of attorney fees for abuse of discretion.[83] The party requesting the fee must provide reasonable documentation of the work performed.[84] And the court must conduct an independent "evaluation of the reasonableness of the fees" and cannot simply rely on the billing records and pleadings of the prevailing party.[85] "Meaningful findings

---

[82] Appellant's Br. at 59.

[83] Berryman v. Metcalf, 177 Wn. App. 644, 656-57, 312 P.3d 745, 753 (2013).

[84] 224 Westlake, LLC v. Engstrom Props., LLC, 169 Wn. App. 700, 734, 281 P.3d 693, 712 (2012).

[85] Berryman, 177 Wn. App. at 677-78.

and conclusions must be entered to explain an award of attorney fees."[86] "The findings must show how the court resolved disputed issues of fact and the conclusions must explain the court's analysis."[87]

Lucas generally challenges the trial court fees and costs order because the court "entered [Daniel's] proposed fee award without *any* changes."[88] Although the court approved the amount requested by Daniel, this does not mean the court did not conduct an independent evaluation of the reasonableness of the fees. The court took care to enter 50 findings of facts to justify its reasonable fee calculation.[89] The court entered sufficiently meaningful findings of fact and conclusions of law to explain the award.

Lucas's other challenges to costs paid by Gravity, duplicative fees for multiple attorneys, and fees for time unrelated to litigation are not compelling.

We conclude the court did not abuse its discretion when it awarded attorney fees and costs to Daniel.

*VI. Postjudgment Interest*

Lucas also argues the trial court erred when it applied a 12 percent postjudgment interest rate to Daniel's judgment.

---

[86] Id.

[87] Id. at 658.

[88] Appellant's Br. at 62.

[89] See Choung Van Pham v. Seattle City Light, 159 Wn.2d 527, 540, 151 P.3d 976 (2007) ("In this case, the trial judge took care to enter 35 findings of fact justifying his reasonable fee calculation.").

Postjudgment interest is mandatory under RCW 4.56.110.[90] As a result, a trial court's award of postjudgment interest is a matter of law that we review de novo.[91] Under RCW 4.56.110, the appropriate interest rate amount depends on the foundation of the particular judgment. "Judgments founded on written contracts . . . shall bear interest at the rate specified in the contracts."[92] If the contract does not provide a rate, "judgments shall bear interest . . . at the maximum rate permitted under RCW 19.52.020."[93] The highest permissible interest rate is 12 percent per annum.[94]

Here, the judgment of attorney fees and costs to Daniel is founded on a contract, specifically, the shareholders agreement.[95] And because the shareholders agreement does not identify a specific interest rate, the court properly applied the statutory maximum rate.

We conclude the trial court did not abuse its discretion in setting the postjudgment interest rate at 12 percent.

---

[90] TJ Landco, LCC v. Harley C. Douglass, Inc., 186 Wn. App. 249, 256, 346 P.3d 777 (2015).

[91] Id.

[92] RCW 4.56.110(1).

[93] RCW 4.56.110(4); see also TJ Landco, 186 Wn. App. at 260 ("[T]here was no contractual interest rate that governed the award. The trial court correctly applied the 'default' 12 percent interest provided by RCW 4.56.110(4) and RCW 19.52.020(1).").

[94] RCW 19.52.020(1)(a).

[95] See Ex. 11 at 36 ("In the event of any litigation concerning or arising from this Agreement, the substantially prevailing Party shall be entitled to recover from the losing Party or Parties his reasonable attorneys' and paralegal fees and expenses of litigation incurred at trial and appellate levels.").

## VII. Fees on Appeal

Lucas seeks fees on appeal under section 7.14 of the shareholders agreement. Because section 7.14 only provides for an award to the substantially prevailing party and Lucas is not the substantially prevailing party, we deny his request for fees.

Daniel also seeks fees on appeal under section 7.14 of the shareholders agreement and RAP 18.1. Because Daniel is the substantially prevailing party, we grant his request upon his timely compliance with the requirements of RAP 18.1.

Therefore, we affirm.

_____
Cox, J.

WE CONCUR:

_____
Spearman, J.